# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-4013

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Charles McKay McNeil, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  June 15, 1999
Filed: July 16, 1999

_____

Before RICHARD S. ARNOLD and LOKEN, Circuit Judges, and BYRNE,[1] District
Judge.

_____

BYRNE, District Judge.


Charles McKay McNeil appeals his conviction following a jury trial for conspiring to distribute and distributing methamphetamine in violation of 21 U.S.C. §§ 841, 846.  We affirm.

_____

[1]The Honorable Wm. Matthew Byrne, Jr., Senior United States District Judge for the Central District of California, sitting by designation.

# I.  BACKGROUND

On July 1, 1997, McNeil was indicted on one count of conspiring to distribute and one count of distributing approximately 30 pounds of methamphetamine.  On December 9, 1997, a jury found McNeil guilty on both counts.

Valdemar Posadas testified against McNeil at trial.  Posadas had earlier pleaded guilty to conspiring to distribute methamphetamine and agreed to cooperate with the government.  Posadas testified that Eustolio Vargas, a California resident, sold large quantities of methamphetamine and cocaine on a regular basis to a person in Minnesota named Narcisco Delgado, a/k/a "Geuro."  Vargas, who remains a federal fugitive, employed couriers to transport the drugs from California to Minnesota.  Posadas worked for Vargas.  His role was to fly to Minnesota and supervise the delivery of the drugs from the courier to Delgado or Delgado's designee.

In October 1996, Vargas sent Delgado a shipment of 30 pounds of methamphetamine from California to Minnesota.  McNeil was the courier who transported the drugs to Minnesota in a newly acquired white Dodge pickup truck.  Prior to the trip, Vargas and McNeil decided to re-register the truck in Utah with Utah license plates, which Vargas and McNeil thought would attract less police attention than California plates.  While McNeil was driving across country, Posadas flew to Minnesota to await McNeil's arrival.  Posadas stayed in an apartment in St. Paul provided by Delgado.

When McNeil got to St. Paul, he called for directions to the apartment, where Posadas, Delgado, and Delgado's girlfriend, Rosalina Lopez, were awaiting his arrival.  Because Posadas spoke little English, he had Lopez give McNeil the directions.  Delgado and Lopez got tired of waiting for McNeil and left.  McNeil arrived later and gave the 30 pounds of methamphetamine to Posadas.  Posadas then called Lopez and had her come and pick up the drugs.  Later, Vargas told Posadas to pay McNeil for

driving the drugs to Minnesota. Posadas testified that he paid McNeil $9,000 and then went back to California.

In early November 1996, Posadas returned to Minnesota because Delgado was slow in paying Vargas for the methamphetamine, which had been provided to him on credit. The plan was for Posadas to repossess 15 pounds of methamphetamine from Delgado and then for McNeil to drive it back to California. However, Vargas later decided it was too risky to transport the drugs back to California. At Vargas' direction, Posadas sold the 15 pounds of methamphetamine to another co-conspirator in Minnesota, Javier Nunez. That methamphetamine was subsequently seized by FBI agents during a search of Nunez's storage locker.

Lopez, who had also pleaded guilty to methamphetamine conspiracy charges and agreed to cooperate with the government, corroborated Posadas' testimony. Lopez confirmed that her boyfriend, Delgado, distributed large quantities of cocaine and methamphetamine in Minnesota that were supplied by Vargas. Lopez testified that she gave McNeil directions to the apartment on the day the drugs were delivered. After McNeil delivered the drugs to Posadas, Lopez picked up the drugs from Posadas and stored them for Delgado until they could be sold. Lopez testified that she met McNeil face-to-face when she was told by Delgado to pay McNeil some money. McNeil came to her daughter's house and Lopez paid him $10,000 or $11,000.

Elizabeth Cordova, Vargas' girlfriend, testified that she was aware that Vargas was selling large quantities of cocaine and methamphetamine to a person in Minnesota named "Guero" and that McNeil was a frequent drug courier for Vargas. Cordova was aware of at least three to five drug trafficking trips that McNeil made for Vargas, and she personally made at least one drug trafficking trip to Minnesota for Vargas. Cordova testified that Vargas paid McNeil $10,000 for each trip. The government granted immunity to Cordova in return for her testimony against McNeil.

Telephone records and search warrant evidence corroborated the testimony of the cooperating witnesses. FBI agents executed a search warrant at McNeil's residence in Minnetonka, Minnesota on April 2, 1997. In McNeil's bedroom, they found a piece of paper with both Posadas' and Lopez's telephone numbers on it, as well as the address of the apartment where McNeil had delivered the 30 pounds of methamphetamine. Agents also found documents relating to the re-registering of the white Dodge pickup truck in Utah approximately a week before McNeil's trip to Minnesota.

McNeil testified in his own defense. He acknowledged that he knew Vargas, Cordova, and Posadas. He also admitted speaking with and meeting Lopez, but he denied receiving any money from her. McNeil, who was in the automobile credit repair and insurance business, stated that he and Vargas, who worked for an automobile dealer, would refer business to one another and that it was through this association that he met Cordova and Posadas. When McNeil moved to Minnesota, Vargas told him to contact Posadas, who had earlier moved there and opened a Mexican restaurant. McNeil testified that Posadas telephoned him in late October and asked if McNeil would visit him. McNeil agreed, and a woman gave him directions to the apartment where Posadas was staying. McNeil denied delivering or seeing any drugs at the location and, when Posadas subsequently contacted McNeil and requested that he send $118,000 to Vargas, McNeil declined. A number of defense witnesses corroborated various parts of McNeil's testimony.

Following McNeil's conviction, the district court denied McNeil's motion for a new trial. The court sentenced McNeil to the mandatory minimum term of 120 months imprisonment, to be followed by five years of supervised release. The sentence included a 31-month downward departure pursuant to U.S.S.G. § 5K2.0.

## II. DISCUSSION

McNeil contends on appeal that the district court erred when it: (1) denied his motion to suppress evidence; (2) admitted prior bad act evidence; (3) failed to charge the jury on the theory of his defense; and (4) denied his motion for a new trial.

### A.    Motion to suppress

McNeil claims that the district court erred in denying his motion to suppress evidence obtained from his Minnesota residence pursuant to a March 25, 1997 search warrant. In the warrant affidavit, an FBI agent stated that a wiretap investigation into the drug trafficking organization of which McNeil was a part began on September 9, 1996. The agent averred that a search of Nunez's locker on December 5, 1996, turned up 15 pounds of methamphetamine and that, shortly after that search, twelve persons, including Lopez and Posadas, were indicted for federal drug violations. The agent's affidavit set forth Lopez's and Posadas' statements to him regarding McNeil's October 1996 drug delivery.

McNeil asserts that the information contained in the search warrant affidavit was stale and insufficient to establish that contraband or evidence of crime would be found at his residence. McNeil also contends that the search warrant affidavit contained false statements and material omissions and that he was entitled to a Franks hearing to determine the validity of the warrant.

#### 1.    Staleness

We review de novo the trial court's ruling on a motion to suppress, "evaluating only for clear error, however, any findings of fact by the trial court and giving appropriate deference to the inferences apparently drawn from those facts by law enforcement officers, the court that issued the search warrants, and the trial court."

United States v. Hall, 171 F.3d 1133, 1142 (8th Cir. 1999).  Because McNeil never challenged the search warrant on staleness grounds in the district court, the issue has not been properly preserved for appeal, and our review is for plain error.  See United States v. Quintanilla, 25 F.3d 694, 698 (8th Cir. 1994).  Plain error is "clear or obvious" error that affects a defendant's substantial rights.  United States v. Johnson, 12 F.3d 827, 835 (8th Cir. 1994).  "Even clear errors will only matter if a miscarriage of justice would otherwise result that might seriously affect the fairness, integrity, or public reputation of the judicial proceedings."  United States v. Tulk, 171 F.3d 596, 599 (8th Cir. 1999).

"There is no bright-line test for determining when information is stale . . . and the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit."  United States v. Koelling, 992 F.2d 817, 822 (8th Cir. 1993).  Rather, "[t]ime factors must be examined in the context of a specific case and the nature of the crime under investigation."  Id.  The evidence sought under the search warrant in this case -- primarily books and records relating to drug trafficking, as well as names, addresses, and photographs of co-conspirators -- is of a type that might have remained on the premises for some time after McNeil's drug courier activities were complete.  See United States v. Humphrey, 140 F.3d 762, 764 (8th Cir. 1998).  Moreover, even if the information in the warrant affidavit was impermissibly stale, the warrant was not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon.  See United States v. Leon, 468 U.S. 897, 922-23 (1984); United States v. Riedesel, 987 F.2d 1383, 1391 (8th Cir. 1993).

Accordingly, the district court did not commit plain error in failing to suppress the search warrant evidence on staleness grounds.

2.      Entitlement to Franks hearing

McNeil requested a Franks hearing to determine whether the magistrate judge who issued the warrant had been misled by intentional or reckless false statements in, or material omissions from, the warrant affidavit.  See Franks v. Delaware, 438 U.S. 154, 155-56 (1978).  The district court denied McNeil's request for a Franks hearing on the ground that McNeil had failed to identify the specific portions of the affidavit that he claimed were false or contained material omissions.

A defendant is not entitled to a hearing to determine the veracity of a search warrant affidavit unless "he or she can make a substantial preliminary showing that a false statement was included in the affidavit (or that relevant information was omitted from it) intentionally or recklessly."  United States v. Mathison, 157 F.3d 541, 547-48 (8th Cir. 1998).  As the Supreme Court explained in Franks,

> [t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.

Franks, 438 U.S. at 171; see also United States v. Wajda, 810 F.2d 754, 759 (8th Cir. 1987) (noting that the requirement of a substantial preliminary showing "is not lightly met").  The defendant must also show "that the allegedly false statement was necessary to a finding of probable cause or that the alleged omission would have made it impossible to find probable cause."  Mathison, 157 F.3d at 548.

McNeil submitted the affidavit of his attorney in support of his request for a Franks hearing.  The affidavit did not identify any specific falsehoods in the warrant

affidavit. It did, however, identify inconsistent statements made by Lopez, and conflicts between Lopez's and Posadas' versions of events, that were not mentioned in the warrant affidavit. McNeil claims that these inconsistencies and conflicts were material to the credibility of Lopez and Posadas and, consequently, to the magistrate judge's probable cause determination.[2]

Although "evidence of an informant's credibility may sometimes be critical to a finding of probable cause," id., a review of the attorney's affidavit reveals that most, if not all, of the inconsistencies and conflicts are between statements made by Lopez on April 11, 1997, and statements made by Lopez and Posadas during the preceding four months. Given that the search warrant affidavit was executed on March 25, 1997, several weeks before Lopez's April 11, 1997 statement, the inconsistencies and conflicts that McNeil contends were intentionally or recklessly omitted from the affidavit did not even exist at the time the affidavit was executed.[3]

Because McNeil failed to identify any false statements or material omissions in the warrant affidavit, the district court did not err in failing to conduct a Franks hearing.[4]

_____

[2]The search warrant affidavit did expressly state that both Lopez and Posadas were cooperating in the investigation pursuant to written plea agreements involving the possibility of sentence reductions.

[3]Nor did they exist at the time of the search, which was conducted on April 2, 1997, nine days before the alleged changes in Lopez's version of events.

[4]McNeil also claims that the warrant affidavit failed to adequately set forth his connection with the place to be searched. This claim lacks merit. The warrant affidavit stated the attesting agent had contacted management at the apartment complex, ascertained that McNeil resided there, and learned that McNeil had been seen at the residence as recently as several days before the affidavit was executed. Although the lease for the apartment was in his girlfriend's name, the affidavit adequately established that McNeil resided there.

B.      Prior bad act evidence

McNeil next claims that the district court abused its discretion under Fed. R. Evid. 403 and 404 when it denied his motion in limine to suppress false identification documents obtained from McNeil's residence and the testimony of Cordova and Posadas regarding earlier drug transactions by McNeil. In denying the motion in limine, the district court found that the evidence was direct evidence of the drug trafficking conspiracy alleged in the indictment and, alternatively, that the evidence was admissible under Fed. R. Evid. 404(b).

"[W]hen a motion to exclude evidence is made in limine and is overruled, if the evidence is thereafter admitted at trial without objection, 'the error, if any, has not been preserved for appeal.'" Huff v. Heckendorn Mfg. Co., Inc., 991 F.2d 464, 466 (8th Cir. 1993) (quoting Starr v. J. Hacker Co., Inc., 688 F.2d 78, 81 (8th Cir. 1982)). Because McNeil did not renew his objection to the challenged evidence at trial, we need not determine its admissibility.[5]

C.      Jury charge

McNeil next claims that the trial court erred by failing to charge the jury on the theory of his defense. McNeil contends that the evidence at trial was insufficient to establish an overall conspiratorial agreement among him and the other conspirators and that he was thus entitled to a multiple conspiracies instruction. McNeil also contends that he presented credible evidence that he was in California or en route to Minnesota on the date the methamphetamine arrived in Minnesota, and that he was thus entitled

---

[5]Even if we were to review the admissibility of this evidence for plain error, see United States v. Mihm, 13 F.3d 1200, 1204 & n.3 (8th Cir. 1994), we agree with the district court's analysis and thus find no plain error.

to an alibi instruction.

The district court addressed McNeil's claims of instructional error when it denied his motion for a new trial. The court found that defendant had waived any objection to the court's instructions by failing to request either an alibi or a multiple conspiracies instruction.[6] The court further found that, even if McNeil had properly requested an alibi or multiple conspiracies instruction, the evidence at trial did not warrant the giving of either.

"A district court has broad discretion in instructing the jury, and jury instructions 'do not need to be technically perfect or even a model of clarity.'" Morse v. Southern Union Co., 174 F.3d 917, 926 (8th Cir. 1999) (quoting Cross v. Cleaver, 142 F.3d 1059, 1067 (8th Cir. 1998)). Where, as here, a defendant fails to preserve a claim of instructional error, our review is for plain error. See id. "Under plain error review, we reverse 'only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected.'" Id.

The district court's failure to give a multiple conspiracies instruction, even if presumed to have been erroneous, cannot have prejudiced McNeil, much less resulted in a miscarriage of justice. Count One of the indictment charged McNeil with conspiring to distribute methamphetamine. Count Two of the indictment charged him with distributing 30 pounds of methamphetamine. The jury unanimously convicted McNeil on both counts, and there is little danger that the conviction on Count One was based on activity not encompassed in Count Two.

---

[6]While McNeil had initially requested a multiple conspiracies instruction in discussions with the court, the court suggested an instruction that the defendant was on trial only for the crimes charged in the indictment. McNeil agreed to this instruction and never renewed his request for a multiple conspiracies instruction.

Nor did the evidence in the case require the giving of an alibi instruction. McNeil only had an alibi for October 15, 1996, and the evidence was uncontested that McNeil arrived in Minnesota from California no later than October 22, 1996. The indictment did not specify a particular date for the drug transaction, but instead charged a distribution "[i]n or about October, 1996." Moreover, while an FBI agent had testified before the grand jury that the drugs were delivered on October 15, 1996, the same agent testified at trial that the October 15 date was only a rough estimate at that stage of the case. Finally, Posadas testified that the drug transaction actually occurred on October 20 or 23, 1996.

D.     New trial motion

McNeil's final claim is that the district court erred in denying his motion for a new trial which raised four primary grounds: (1) failure to give an alibi instruction; (2) failure to give multiple conspiracies instruction; (3) alleged juror misconduct;[7] and (4) alleged failure to rule on admissibility of Rule 404(b) evidence. McNeil's motion also included some general challenges to the reliability of the government's witnesses and to the admissibility of certain hearsay statements. The district court found no merit to any of McNeil's arguments, and we review the district court's denial of McNeil's new trial motion for an abuse of discretion. See Denesha v. Farmers Ins. Exch., 161 F.3d 491, 497 (8th Cir. 1998).

On appeal, McNeil focuses almost exclusively on the reliability of the government's witnesses. McNeil emphasizes that all of the witnesses against him were either members of the conspiracy or received immunity for their testimony and that much of their testimony was riddled with inconsistencies. McNeil's challenge is "little

[7]McNeil claimed juror misconduct in that one of the jurors knew a defense witness. After an evidentiary hearing, the district court found no evidence of juror misconduct. McNeil does not challenge this determination on appeal.

more than an invitation to determine the credibility of witnesses, which was
. . . a task for the jury to perform." Greaser v. Missouri, Dept. of Corrections, 145 F.3d
979, 983 (8th Cir. 1998); see also Manatt v. Union Pac. R.R. Co., 122 F.3d 514, 518
(8th Cir. 1997).

McNeil also contends that Cordova was improperly permitted to testify to
numerous hearsay statements, including Cordova's testimony that Vargas told her that
McNeil was transporting the drugs to Minnesota. By failing to timely object to the
admission of this testimony, however, McNeil failed to preserve this issue for appeal.
See Bevan v. Honeywell, Inc., 118 F.3d 603, 611 (8th Cir. 1997). Even if the issue had
been preserved, we would find no error as the evidence was sufficient for the district
court to conclude that both Cordova and Vargas were unnamed co-conspirators and
that Vargas' statements were made in furtherance of the conspiracy. See Fed. R. Evid.
801(d)(2)(E); United States v. Bell, 573 F.2d 1040, 1043 (8th Cir. 1978).

## III.    CONCLUSION

For the foregoing reasons, the court AFFIRMS the district court's judgment of
conviction.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.