# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2506EM

_____

United States of America,              *

                         *

          Appellee,         *

                         *   On Appeal from the United

     v.                  *   States District Court

                         *   for the Eastern District

                         *   of Missouri.

Mar James, also known as    *

James Beine,               *

                         *

          Appellant.       *

_____

Submitted:  November 18, 2003

Filed:  December 23, 2003

_____

Before RILEY, RICHARD S. ARNOLD, and MELLOY, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

This case raises important issues under the Fourth Amendment. In particular, under what circumstances do law-enforcement officers have a reasonable perception that a third person has the authority of the owner to allow officers to inspect the contents of a computer disc entrusted to him by the owner? What are the limits of the inevitable-independent-discovery exception to the warrant requirement? In the particular factual setting presented by this case, we agree with the defendant, Mar

James, that his motion to suppress certain evidence should have been granted. We therefore reverse Mr. James's conviction for possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), and remand this case for further proceedings.

I.

In March 2002, Mr. James was arrested in his home state of Illinois on a St. Louis arrest warrant alleging that he had engaged in several counts of sexual misconduct involving a child, in violation of Missouri state law. He was held in the Madison County Jail awaiting extradition to Missouri.[1]

While detained, the defendant attempted to smuggle out of the jail a letter to friends, Mike and Carrie Finley. He gave the letter to another inmate, William Longwell, who then gave the letter to his lawyer, Edward Moorman, to mail. Mr. Moorman, however, did not mail the letter. Instead, he read it, and, believing it contained evidence of a crime, got in touch with Assistant Illinois State Attorney Neil Schroeder. After reading the letter, Mr. Shroeder sent it to Edward Postawko, the attorney in St. Louis responsible for prosecuting Mr. James on the Missouri sexual-misconduct charges.

The letter instructed the defendant's friends to:

> CALL Michael Laschober 636-296-2296 for him [ASK HIM to forward mail to you] Also tell Michael to destroy and scratch ALL backup CD discs he has (BROWN envelope I just left) these are old and useless and one has a virus tell him to be sure to cut it up too . . ..

---

[1]Mr. James was found guilty of the Missouri state law charges. He is currently serving a four-year prison sentence.

-2-

According to trial testimony, Mr. Laschober had known Mr. James since he was eight-years old and that Mr. James, whom Mr. Laschober referred to as Father Jim, had presided over his marriage, at a time when he was a functioning clergyman.

Mr. Postawko, believing that the discs might be of some value to his case, sent two detectives to Mr. Laschober's home in Arnold, Missouri. The detectives read the letter before going to Mr. Laschober's home. Mr. Laschober consented to being questioned about his relationship with Mr. James. He explained that he had seen defendant a couple of weeks before, and that Mr. James had personally delivered some computer discs for storage as back-ups, and picked up his mail. Mr. Laschober explained that Mr. James had his mail delivered to Mr. Laschober, and that Mr. Laschober at least once had opened it and read it. He further explained that Mr. James frequently brought him computer discs to store. Mr. James apparently was concerned that his personal computer would crash or be destroyed, and he wanted to ensure the safety of his back-up discs by storing them offsite.

The detectives asked Mr. Laschober if he still had the discs that Mr. James had most recently brought. Mr. Laschober said that he did and asked if the police would like to see them. He then retrieved the brown envelope, which was addressed to Mar James and sealed with tape. The detectives asked Mr. Laschober if he knew what was on the discs. Mr. Laschober said that he believed the discs contained church and financial records, as the discs that Mr. James had previously dropped off had been so marked.

The detectives asked Mr. Laschober if he knew how many discs were in the envelope. He said no, but he offered to open the envelope and look. He then went to the sink to get a knife. The detectives stopped him, explaining that for their own safety they would rather he not handle a knife. They then asked if it would be all right if they opened the envelope. Mr Laschober said, "sure, go ahead." One of the

detectives opened the envelope using his own pocket knife and found ten discs stacked on top of each other and held together with blue tape. The top disc had a note attached which read "CD VIRUS DANGER, CONFIDENTIAL CLASSIFIED, VIRUS RESEARCH PROJECT CONTAMINATED CD – DANGER PERSONAL PRIVATE." The detectives asked Mr. Laschober if they could take the discs with them, and he consented, signing a modified consent form.

After arriving back at the station, the detectives attempted to view the discs, specifically the VIRUS disc. Unable to open the disc's files, the detectives sought the assistance of another officer who had computer expertise. On a more sophisticated computer, the officer was able to open the disc and found digital images of child pornography. Before viewing the discs, and before visiting Mr. Laschober, the detectives never sought and never acquired a warrant to search or to seize the discs.

Mr. James was then charged with possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Before trial, Mr. James moved to suppress the discs, arguing that the detectives had violated the Fourth Amendment. The issue was heard first by a Magistrate Judge, who recommended on December 5, 2002, that the motion to suppress be denied. As part of that recommendation, the Magistrate Judge specifically advised both parties that they had eleven (11) days to object to the recommendation, and that failure to do so might result in the loss of the right to appeal findings of fact. On March 4, 2003, after a de novo review of the record, the District Court accepted the recommendation of the Magistrate Judge and denied the motion to suppress. On March 14, 2003, after voir dire had taken place, Mr. James filed a writing styled: "Defendant's Objections to Magistrate's Findings of December 5th, 2002 and The Court's Adoption of Same on March 4, 2003 Renewed Motions to Suppress and Statement and Memo in Support of Motion to Suppress." The District Court denied the objections as untimely on March 17, 2003. The jury trial proceeded. Mr. James was found guilty and sentenced to fifty-seven (57) months in jail (four years and nine months) and a $10,000 fine. This appeal followed.

II.

The first issue we must decide is our standard of review. Ordinarily, we review for clear error the facts supporting a denial of a motion to suppress and review <u>de novo</u> the legal conclusions based on the facts. <u>United States v. Looking</u>, 156 F.3d 803, 809 (8th Cir. 1998). "However, where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error." <u>Ibid.</u> Our review of the questions of law, however, remains <u>de novo</u>. <u>United States v. Collins</u>, 321 F.3d 691, 694 (8th Cir. 2003). Because Mr. James did not make a timely objection to the Magistrate Judge's recommendation, the government says, the facts must be reviewed on a plain-error standard only. <u>United States v. McNeil</u>, 184 F.3d 770, 775 (8th Cir. 1999).

Our authority to review questions not timely raised by the parties for plain error comes from Federal Rule of Criminal Procedure 52(b). Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). In defining the standard appellate courts should use in plain-error review, the Supreme Court has directed that we should first look to see if there was an error. <u>United States v. Olano</u>, 507 U.S. 725, 732 (1993). Second, we ask whether the error was plain. <u>Ibid.</u> And then we decide whether the error affects substantial rights. <u>Ibid.</u> See also <u>McNeil</u>, 184 F.3d at 775. Clarifying when the error is plain, the Court explained that " '[p]lain' is synonymous with 'clear' or, equivalently, 'obvious.' " <u>Olano</u>, 507 U.S. at 734. Affecting substantial rights, the Court explained, means that the error must have "affected the outcome of the district court proceedings." <u>Ibid.</u> The defendant, and not the government, bears the burden of demonstrating that the error affected the outcome. <u>Ibid.</u>

Our decision whether to reverse on plain-error review is permissive and not mandatory. <u>Id.</u> at 735. As a guiding principle, we exercise our discretion when a

miscarriage of justice would otherwise result. Id. at 736. In the circumstances of this case, we exercise our discretion to reach the errors discussed below and reverse the judgment. Not doing so would, in our opinion, condone a stark violation of Fourth Amendment rights. The Warrant Clause is not a technicality. It is a basic protection of a citizen's right of private property. To endorse the detectives' disregard for Amendment would be to grant a broad power to law enforcement going beyond the evils even of the infamous General Warrant.

## III.

The recommendation of the Magistrate Judge, adopted in full by the District Court, gave four independent reasons for denying the suppression motion. First, Mr. Laschober gave valid consent to the search. Second, even if the consent was invalid, the police were justified in relying on Mr. Laschober's apparent authority to consent. Third, the search was justified, in any event, under the doctrine of abandonment. And fourth, the evidence would have inevitably been discovered anyway as a result of an alternative line of investigation. We respectfully disagree with all four of these rationales.

## A.

The District Court found that Mr. Laschober had common authority over the discs because of his possession of the discs and his previous opening (on one occasion, anyway) of Mr. James's mail. We believe this finding was plain error.

Generally, the Fourth Amendment requires that a warrant be issued by a neutral magistrate on probable cause before an item can be searched or seized. See United States v. Harris, 453 F.2d 1317, 1321 (8th Cir. 1972). There are, however, a few exceptions to the warrant requirement. United States v. Riedesel, 987 F.2d 1383,

1388 (8th Cir. 1993). If the government wishes to rely on an exception, it bears the burden of demonstrating that the exception exists. Ibid.

At the suppression hearing, the government relied on Mr. Laschober's consent to the search of Mr. James's discs to excuse its failure to obtain a warrant. Consent to search, a valid exception to the warrant requirement, Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973), may be given either by the suspect or by some other person who has common authority over, or sufficient relationship to, the item to be searched. United States v. Matlock, 415 U.S. 164, 171 (1974). Common authority is a function of mutual use, joint access, and control, United States v. Bradley, 869 F.2d 417, 419 (8th Cir. 1989), and is a question of fact. United States v. Baswell, 792 F.2d 755, 758 (8th Cir. 1986). Thus, whether Mr. Laschober had actual authority to consent is a question of fact, and we review the evidence for plain error looking to see whether the government produced evidence sufficient to show that he had the requisite authority.

Most consent cases involve jointly occupied places and a roommate or cotenant who allows a search of shared space. See, e.g., Bradley, 869 F.2d at 419. In these instances, the factual finding of common authority makes intuitive sense. The space is jointly resided in; the parties expect intrusions into each other's limited space as a function of communal living.[2] This is not necessarily the case when the person claimed to have given consent is only a bailee.

A review of our case law and the law of other circuits shows that although a bailee of a concealed item may have potential physical access to the inner contents

_____

[2]We do not mean to establish a *per se* rule for shared space. See, e.g., United States v. Block, 590 F.2d 535, 541 (4th Cir. 1978) (holding that while a mother could consent to a search of her son's room, she did not have authority to consent to a search of a locked footlocker within the room). Instead, we note the greater ease with which common authority can be found in a shared-space situation.

of the item (he can pick the lock; break the seal; open up the storage bin), this kind of access does not mean the bailee has actual authority to look at the contents of the items, or to consent to another's searching them. Put another way, one does not cede dominion over an item to another just by putting him in possession. For example, one does not give authority to a common carrier to turn over goods he shipped to law enforcement merely by entrusting the goods to the common carrier. United States v. Kelly, 529 F.2d 1365, 1371 (8th Cir. 1976). A girlfriend does not give her boyfriend authority to consent to a search of her purse left in the trunk of a rental car by the mere fact of their relationship and her having left it in the car. United States v. Welch, 4 F.3d 761, 764 (9th Cir. 1993). A person who entrusts a briefcase to a friend solely for storage and then instructs the friend to destroy the briefcase does not thereby give the friend authority to let the FBI search the briefcase. United States v. Basinski, 226 F.3d 829, 834 (7th Cir. 2000). A lessee does not have authority to consent to a search of the lessor's financial records stored at the leased house merely on account of the lessor-lessee relationship. Marvin v. United States, 732 F.2d 669, 675-76 (8th Cir. 1984). Therefore, in order to show the validity of Mr. Laschober's consent, the government needed to introduce evidence of authority beyond the mere act of storage.

We are firmly convinced that Mr. James did not give permission to Mr. Laschober to exercise control over the discs, or to consent to the searching of the discs. Instead, he gave the discs to Mr. Laschober for the sole purpose of storing them (except that, as the police knew, but Mr. Laschober did not, the defendant had given instructions that the discs be destroyed). The discs came to him in sealed envelopes. They were packaged within the envelope in tape. Mr. James never told Mr. Laschober "go ahead and look at these." Instead, he asked only that they be stored (and, as we have noted, that all of them be destroyed). Further, defendant marked the disc in question "confidential" and "private," evidencing a desire that no one, including Mr. Laschober, view the contents of the disc. Cf. Trulock v. Freeh, 275 F.3d 391, 403 (4th Cir. 2001) (finding no authority to search personal files on a

shared computer because defendant had evidenced a privacy interest in protecting the files with a password).  Similarly important, the disc could not be opened on just any computer.  To get access to the disc, a special officer had to use an advanced computer.  Taken as a whole, such demonstrations of intended privacy evidence Mr. James's expectation that Mr. Laschober not view the disc's contents.

The fact that Mr. Laschober opened Mr. James's mail, on at least one occasion, is of little or no consequence in our analysis.  In opening the mail, Mr. Laschober was acting pursuant to express authorization by Mr. James.  Mr. James told him to do so.  In contrast, Mr. James never told Mr. Laschober to look at the discs.  He told him to store them.  Nothing within that instruction gave Mr. Laschober the right to let others look at the discs.  The grant of authority to open the mail does not presuppose a grant of authority to look at the discs.  It is a stretch of logic to read a limited instruction into a broader grant.  If Mr. James had intended to allow Mr. Laschober to look at the discs, why would he have delivered them sealed in tape, sealed in an envelope, with "confidential" written across the top of the pertinent disc?  We have a definite and firm conviction that Mr. Laschober had no common authority either to look at the contents of the discs, or to allow anyone else to do so, and that the absence of evidence to this effect is plain.

B.

The District Court also found that the detectives reasonably believed that Mr. Laschober had the authority to consent, even if he did not in fact have it.  As the Supreme Court has stated, the rule for law-enforcement officers' reliance on a consenting party's apparent authority "is not that they always be correct, but that they always be reasonable."  Illinois v. Rodriguez, 497 U.S. 177, 185-86 (1990).  Mr. James contends that the detectives' reliance on Mr. Laschober's apparent authority was unreasonable.  We agree.

The determination of whether the government's reliance on Mr. Laschober's consent was reasonable is a question of law that we review <u>de novo</u>.  See <u>United States v. Jones</u>, 269 F.3d 919, 927 (8th Cir. 2001) ("The ultimate determination of reasonableness under the Fourth Amendment is a question of law which we review <u>de novo</u>.");  see also <u>United States v. Ringold</u>, 335 F.3d 1168, 1171 (10th Cir. 2003).  On review, we ask this question:  would the facts available to the officer at the time the consent is given warrant a person of reasonable caution in the belief that the consenting party had authority over the item to be searched?  <u>Rodriguez</u>, 497 U.S. at 188;  <u>United States v. Sanchez</u>, 32 F.3d 1330, 1333-35 (8th Cir. 1994).  We think the answer has to be no.

At the time of the consent, the detectives knew the following.  Mr. Laschober was Mr. James's long-time friend.  Mr. James at times had his mail delivered to Mr. Laschober's home, and Mr. Laschober had at least once opened the mail.  Mr. James had Mr. Laschober store back-up discs for him on previous occasions.  On this occasion the discs were stored in a sealed envelope that bore Mr. James's name on the front.  They knew that the discs contained in the envelope belonged to defendant and not Mr. Laschober.  They knew, once the envelope had been opened, that the top disc said "confidential," "personal," "private."  They knew that it took an advanced computer to view the disc's contents.  And they had a piece of information that Mr. Laschober did not.  They knew that his <u>actual</u> authority had changed.  They knew, because they had intercepted and read the letter to Carrie Finley, that Mr. Laschober's only authority was to scratch and destroy the discs.  This last fact is critical.

It cannot be reasonable to rely on a certain theory of apparent authority, when the police themselves know what the consenting party's <u>actual</u> authority is — in this case, not to store the discs, but to destroy them.  The standard of reasonableness is governed by what the law-enforcement officers know, not what the consenting party knows.  Here the detectives knew too much about Mr. James's manifested desire to

-10-

keep others, including Mr. Laschober, from seeing the contents of the disc to rely on Mr. Laschober's authority to consent.

## C.

The District Court further found that Mr. James had abandoned the property when he delivered it to Mr. Laschober. We hold that the property had not been abandoned.

A warrantless search of abandoned property does not violate the Fourth Amendment, as any expectation of privacy in the item searched is forfeited upon its abandonment. United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997). An abandonment determination is a question of fact, see United States v. Caballero-Chavez, 260 F.3d 863, 866 (8th Cir. 2001), which, given Mr. James's failure to object properly to the Magistrate Judge's recommendation, we review for plain error. McNeil, 184 F.3d at 775. At the suppression hearing, the government bore the burden of establishing that Mr. James had abandoned the discs. Kelly, 529 F.2d at 1371. Two principal factors guide our review: first, whether Mr. James denied ownership of the item, and second, whether he physically relinquished the item. United States v. Landry, 154 F.3d 897, 899 (8th Cir. 1998).

Neither factor supports a finding of abandonment. Mr. James never denied ownership of the discs. In fact, at the time of the search, Mr. James had claimed ownership in the only way he could. He had put his name on the outside of the envelope. Second, Mr. James did not physically relinquish the discs in a way that demonstrates abandonment. For example, in United States v. Chandler, 197 F.3d 1198 (8th Cir. 1999), and United States v. Liu, 180 F.3d 957 (8th Cir. 1999), the two cases principally relied on by the District Court, the defendants physically left items in a manner manifesting an intent never to reclaim them. In Chandler, a suspended police officer left a duty bag full of narcotics in the police station for eight months

and never inquired back to claim the contents of the bag. Chandler, 197 F.3d at 1199. In Liu, a passenger on a train got off the train leaving the bag filled with narcotics behind after a police officer began inquiring into the bag's contents. Liu, 180 F.3d at 958-59. Both defendants seemed to be abandoning the items with the hope that they would prevent association with the contraband. Such is not the case with Mr. James. He simply gave the discs to Mr. Laschober to store. We are convinced that a person does not abandon his property merely because he gives it to someone else to store. Basinski, 226 F.3d at 837; see Kelly, 529 F.2d at 1371. A bailor, by definition, does not retain possession of a thing, but he still has title and the right to instruct the bailee as to what to do with it, including returning it, or, as here, destroying it.

Nor do we find any support for the abandonment theory from Mr. James's instruction to destroy the discs. As the Seventh Circuit reasoned in a similar case, the destruction order "did not invite all the world to rummage through the [discs] at will . . .." Basinski, 226 F.3d at 838. Instead, the destruction order "manifested a desire that nobody possess or examine the contents of the [discs]." Ibid. It was in essence the ultimate manifestation of privacy, not abandonment.

We hold that the District Court's finding that Mr. James abandoned the discs was plain error. Mr. James did not abandon the discs when he gave them to Mr. Laschober to store, nor did he abandon them when he gave the instruction to destroy them.

D.

As a last alternative holding, the District Court held that even if the search and seizure of the discs did violate the Fourth Amendment, the discs need not be suppressed, because of the doctrine of inevitable discovery. We respectfully disagree.

The inevitable-discovery doctrine posits that if the prosecution can establish by a preponderance of the evidence that the information, otherwise to be suppressed under the exclusionary rule, ultimately or inevitably would have been discovered by lawful means, then the exclusionary rule does not apply. Nix v. Williams, 467 U.S. 431, 444 (1984). In making a demonstration of inevitable discovery, our case law requires the prosecution to show that: (1) there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation. United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997). Because there was no evidence of an alternative line of investigation, we need not reach the question of reasonable probability.

In finding that the discs would have been inevitably discovered, the District Court reasoned:

> the police were actively pursuing the investigation of defendant on the child sexual misconduct charges he was facing in the City of St. Louis and clearly they would have eventually come upon his use of the computer and would have proceeded to investigate, given the widespread use of the computer and internet for the dissemination of pornography and the known tendency of pedophiles to make full use of it.

The law requires that the government prove that there was, at the time of the search of the disc, an actual other investigation that would have led to discovery of the otherwise unconstitutionally obtained evidence. Certainly the St. Louis detectives were in charge of the investigation of Mr. James on the sexual-misconduct charges. But he had already been arrested on these charges, and was in jail. The investigation appears to have been over. In any event, there is no evidence in this record that the

-13-

detectives were pursuing it. There was no evidence at all of any then-existing alternative investigation.

We are not concerned that the lack of evidence from the record may be attributed to oversight by the prosecutor. Just as Mr. James has had to endure the additional burden of showing plain error due to his failure to object timely to the Magistrate Judge's recommendation, so too must the government endure the consequences of failing to construct a record carefully.

Because of this complete lack of evidence, we hold that the application of the inevitable-discovery rule was incorrect.

IV.

In sum, we find that the detectives' behavior in this case did violate the Fourth Amendment, and that the evidence should have been suppressed. While a warrant to search the discs might perhaps have been obtained, that is beside the point. At the time of the search, there was no valid exception to the warrant requirement justifying the detectives' behavior. The law constrains us to reverse the judgment of the District Court, and to remand this case for further proceedings consistent with this opinion.

It is so ordered.

_____