# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3808

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Gerald Dean Janis, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 17, 2004
Filed:  November 1, 2004

_____

Before MORRIS SHEPPARD ARNOLD, FAGG, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

Gerald Dean Janis (Janis) appeals his conviction for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).  Janis contends the district court[1] erred by (1) denying his motion to suppress, (2) refusing to permit a defense medical witness to testify, and (3) permitting a government expert witness to testify. We affirm.

_____

[1]The Honorable Richard H. Battey, United States District Judge for the District of South Dakota.

# I.    BACKGROUND

Shortly after midnight on October 20, 2002, Janis shot himself in the leg with a semiautomatic pistol at his home in Pine Ridge, South Dakota. Janis was at his home with his niece, Daphne Janis (Daphne), Daphne's son, and Mozella Albert (Albert), a long-time adult friend who had arrived at approximately 8:00 p.m. Albert entered Janis's bedroom, where Janis was sitting with a partially disassembled handgun, when she heard the gun fire one time. Albert was not looking at Janis at the time of the shooting. Janis walked out of the bedroom, Albert followed, and Janis told Albert to take him to the hospital. Albert tied Janis's belt around his leg and took him to the hospital.

After Janis and Albert arrived at the Pine Ridge Hospital, tribal police officers Preston Good Voice Flute (Officer Flute) and Hin Hahn Loud Hawk (Officer Hawk) arrived and spoke to Albert. Albert informed them Janis had shot himself "in her room." After a short discussion, Albert offered to take the officers to the house and show them the gun. The officers followed Albert to the house. When they arrived, a puddle of blood was on the driveway and a trail of blood led up the steps to the house. Albert walked to the front door and entered without knocking, leaving the front door and the screen door open. Albert motioned for the officers to enter and said, "Come on in. Come on in," then pointed toward the hallway to the bedroom. Albert took Officer Flute to the bedroom, where he observed firearms in the room, including a handgun on the bed with a shell casing jammed into the action, and two shotguns. Officer Flute noticed a trail of blood in the hallway and in the bedroom.

After asking Albert, Daphne, and the child to leave the house, Officer Flute secured the scene by making sure no one entered or left the house. At this same time, Bureau of Indian Affairs Special Agent John Long (Agent Long) went to the hospital and spoke to Nurse Patricia Broberg (Broberg), who gave Agent Long the ammunition she found in Janis's jeans. Agent Long then went to the house and found two loaded shotguns and a loaded magazine clip next to a handgun. Agent Long

photographed the scene, and seized the firearms, a loaded magazine clip, a live 9mm round, and a spent casing.

Janis moved to suppress the items seized during the warrantless search. The magistrate judge recommended denying the motion because exigent circumstances supported the warrantless search, though the magistrate judge found consent had not been given and the items would not have been inevitably discovered. The district court adopted the magistrate judge's findings and denied the motion, but also concluded, as an additional ground for denial, that Albert had given a valid consent to search.

At trial, Agent Derek Hill (Agent Hill) testified he ordered fingerprint cards to establish Janis was the same "Dean Janis" convicted of felony possession of a controlled substance in 1987. The government called Detective Michael Jordahl (Detective Jordahl) of the Rapid City Police Department as a fingerprint expert to testify the 1987 and 2003 fingerprints matched. Janis objected to the expert, because the government identified the expert late and because Janis did not have enough time to challenge the expert's reliability. The district court overruled the objection, offering a continuance and the hiring of a defense expert. Janis did not accept the offer.

Janis sought to present testimony from his treating physician, Dr. Michael Statz (Dr. Statz), that Janis had been shot twice in the leg. The district court refused to allow Dr. Statz to testify. Janis asserted during an offer of proof that Dr. Statz would testify there were two wounds, one of which could not have been self-inflicted. Janis was convicted of being a felon in possession and sentenced to 60 months imprisonment.

## II. DISCUSSION

### A. Motion to Suppress

When considering a suppression order, we review the district court's factual findings for clear error and review de novo its conclusion about whether the Fourth Amendment was violated during the search. United States v. Hessman, 369 F.3d 1016, 1019 (8th Cir. 2004). Guided by this standard, we must affirm the district court's decision on a suppression motion "unless it is not supported by substantial evidence on the record; it reflects an erroneous view of the applicable law; or upon review of the entire record, [we are] left with the definite and firm conviction that a mistake has been made." United States v. Perez-Perez, 337 F.3d 990, 993-94 (8th Cir. 2003) (citation omitted). We also review de novo "the ultimate determination of whether the facts as found constitute exigent circumstances." United States v. Gill, 354 F.3d 963, 967 (8th Cir. 2004) (citation omitted).

Janis contends the warrantless search of his home was illegal because the officers did not have consent, exigent circumstances did not exist to justify the search, and the warrantless seizure of evidence was unreasonable. The district court ruled Albert consented to the officers' entry and search of the bedroom, and also that exigent circumstances existed to justify the warrantless entry.

#### 1. Consent

Voluntariness of consent is a question of fact determined by viewing the totality of relevant circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Consent "may be given either by the suspect or by some other person who has common authority over, or sufficient relationship to, the item to be searched." United States v. James, 353 F.3d 606, 613 (8th Cir. 2003). "Common authority is a function of mutual use, joint access, and control, and is a question of fact." Id. (citations omitted). "[T]he rule for law-enforcement officers' reliance on a consenting party's apparent authority 'is not that they always be correct, but that they always be reasonable.'" Id. at 615 (quoting Illinois v. Rodriguez, 497 U.S. 177,

185-86 (1990)).  A warrantless entry is valid when based on consent of a third party whom police, at the time of entry, reasonably believe possesses common authority over the premises.  Rodriguez, 497 U.S. at 179, 189.

Under Rodriguez, the Fourth Amendment is not violated if "'the facts available to the officer' at the time of the search would warrant a reasonable man in the belief that someone with authority over the premises consented to the search."  Iron Wing v. United States, 34 F.3d 662, 665 (8th Cir. 1994) (quoting Rodriguez, 497 U.S. at 188).  "[A]n adult co-occupant of a residence may consent to a search."  United States v. Jones, 193 F.3d 948, 950 (8th Cir. 1999).  In Rodriguez, the defendant's girlfriend, who had not lived at the searched residence for several months, offered to take officers to what she called "our" apartment so they could arrest the defendant.  Rodriguez, 497 U.S. at 179.  The officers did not inquire as to whether the girlfriend still resided there, but instead followed her to the apartment, received her permission to enter, then arrested the defendant.  Id. at 180.  The Supreme Court ruled the evidence seized did not have to be suppressed, because the officers reasonably, albeit erroneously, believed the girlfriend had authority to consent to the entry and search.  Id. at 185-86.

Similarly, in Iron Wing, we rejected the argument that it was unreasonable for the police to believe the defendant's sister-in-law had authority over the premises, although she did not have a key and crawled in through the window.  Iron Wing, 34 F.3d at 665.  We also rejected the contention that a key was required to establish authority over the premises.  Id.  The sister-in-law corroborated her assertion she was living at the house by demonstrating familiarity with the house, and by the fact she knew she had left a bedroom window unlocked.  Id.

Based on the record before the court, we cannot conclude the district court clearly erred in finding Albert consented to the officers' search of the house.  The officers in this case had no reason to doubt Albert's authority to invite them into the

house. Albert told officers she and Janis had been "in her room," offered to lead the officers to the house, told the officers she would show them the gun, entered the house without knocking, left both doors open for the officers to enter, gestured for Officer Flute to enter after she entered, and said to Officer Flute, "Come on in. Come on in." Neither Albert (in her 40s) nor Daphne (in her 20s) objected to the officers entering the house. The officers did not use force, threats, or guns, and made no show of authority to gain entry into the house. Although Officer Flute asked Albert at the hospital where the gun was located, Albert's subsequent actions and the passage of time indicate her invitation to officers to enter the home was not any form of submission to a claim of authority by the police. Albert did not testify at the suppression hearing to rebut the government's evidence. Contrary to the magistrate judge's conclusion, nothing in the record indicates Albert submitted to a show of authority by the officers.

Unlike the situation in James, the officers here did not know of any limitations on Albert's authority to consent. Rather, all the evidence indicates Albert reasonably appeared to have authority over the premises, and Albert's consent was given freely and voluntarily. Reviewing the record, (1) the evidence before the court is sufficient to warrant a person of reasonable caution to believe the consenting party (Albert) had authority over the place to be searched; (2) Albert's consent was voluntary; and (3) the officers acted reasonably in relying on Albert's consent. See Rodriguez, 497 U.S. at 188. The district court did not err in denying the motion to suppress the evidence based on Albert's consent.

### 2. Exigent Circumstances

Even if the officers did not have a valid consent to search the bedroom, exigent circumstances justified the warrantless search. Officers are allowed to conduct a warrantless search "when faced with certain urgent circumstances[.]" United States v. Esparza, 162 F.3d 978, 980 (8th Cir. 1998). We have long held the "view that legitimate concern for the safety of individuals may constitute 'exigent

-6-

circumstances' justifying warrantless entries and searches." United States v. Antwine, 873 F.2d 1144, 1147 (8th Cir. 1989); see also United States v. Vance, 53 F.3d 220, 222 (8th Cir. 1995) (noting a legitimate concern for safety of law enforcement officers or others constitutes exigent circumstances).

Officer Flute testified the officers entered the house not to conduct a criminal investigation, but to secure the weapon so others would not be harmed. The officers knew a handgun had discharged and injured someone. At the hospital, Albert told officers the handgun was in her room at the house. Officer Flute observed a puddle of blood in the driveway and a trail of blood leading all the way to the door of the house. Officer Flute testified he entered the house for safety concerns, that an "unsafe weapon" was "still out in the open . . . still at the scene," and was still loaded. Although the officers did not say so, the home entry could be justified for the officers to determine whether anyone else was injured or in danger, as the officers followed the trail of blood into the house and into the bedroom where the officers then discovered the guns in plain view. Based on the circumstances, the officers reasonably could have believed exigent circumstances existed, and we conclude their entry was justified.

Accordingly, the officers lawfully entered the Janis home. Once inside, the officers saw three weapons in plain view, which properly were seized under the plain view doctrine. See Mincey v. Arizona, 437 U.S. 385, 393 (1978) ("[T]he police may seize any evidence that is in plain view during the course of their legitimate emergency activities."). The district court properly denied the motion to suppress.

### B.    Medical Expert

We review the district court's exclusion of a defense expert witness for abuse of discretion. United States v. Triplett, 195 F.3d 990, 998 (8th Cir. 1999). "Criminal defendants have a fundamental right to present the testimony of witnesses in their defense." United States v. Turning Bear, 357 F.3d 730, 733 (8th Cir. 2004). "A

defendant cannot establish a violation of this right to offer testimony merely by showing that the court deprived him of that testimony; rather, he must 'at least make some plausible showing of how [the] testimony would have been both material and favorable to his defense.'" Id. (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982)). The right to present defense witnesses is grounded in the Sixth Amendment:

> [T]he Supreme Court [has] noted that although by its terms the Compulsory Process Clause confers only the right to compel witnesses to appear through use of subpoena power, the Clause has consistently been given a broader interpretation. This broader interpretation necessarily encompasses the right to present witness testimony, for the right to compel a witness's presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness's testimony heard by the trier of fact. "The right to offer testimony is thus grounded in the Sixth Amendment even though it is not expressly described in so many words."

Anderson v. Groose, 106 F.3d 242, 246 (8th Cir. 1997) (quoting Taylor v. Illinois, 484 U.S. 400, 407-09 (1988)). "The Sixth Amendment does not guarantee, however, that criminal defendants may call every witness they choose." Richardson v. Bowersox, 188 F.3d 973, 980 (8th Cir. 1999). "A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." United States v. Scheffer, 523 U.S. 303, 308 (1998).

Janis asserts the district court erred in precluding his treating physician, Dr. Statz, from testifying about an alleged second gunshot wound Janis suffered. Janis contends Dr. Statz's testimony would have contradicted the testimony of Albert and Daphne that they heard only one gunshot. Janis also states Dr. Statz's testimony would prove one of the gunshot wounds could not have been self-inflicted, undermining Albert's testimony and bolstering the defense argument that Janis never possessed a gun or shot himself.

Janis presented no evidence to corroborate his "phantom shooter" theory. The relevant evidence in the case against Janis concerned his possession of weapons. The government's case against Janis was strong. Even excluding the testimony of Albert and Daphne, there was still sufficient evidence to convict Janis of possession of the weapons. Regardless of Daphne's and Albert's testimony regarding the number of shots they heard, the evidence at trial overwhelmingly supported a finding Janis possessed the three guns found in Janis's home. The issue at the trial was whether Janis possessed the guns, not the number of times he had been shot.

Regardless whether Dr. Statz's testimony would opine Janis could not have inflicted one of the wounds, no evidence was presented Janis could not have inflicted the other wound. Furthermore, no evidence indicates the second wound, which allegedly could not have been self-inflicted, was incurred at the same time as the wound that resulted from Janis shooting himself on the night in question. Simply because Janis had two wounds does not overcome the evidence showing Janis possessed the guns on October 20, 2002. Janis presented no testimony or evidence in any form that would tend to show a "phantom shooter" shot him. Dr. Statz's testimony could not have contradicted all of the evidence pointing toward Janis's possession of the guns.

Albert testified she saw Janis holding what she described as a disassembled handgun. Daphne testified she saw Janis handling a gun before the shooting occurred. Nurse Broberg found ammunition in Janis's jeans at the hospital. Broberg gave the ammunition, two .12 gauge shotgun shells and a round of 9mm ammunition, to Agent Long, who testified the 9mm round was the same kind as the gun found on the bed. One spent 9mm casing (not two) was found in the bedroom. Finally, and most importantly, three weapons were found in Janis's home.

At trial, although Janis moved for a mistrial based on the exclusion of Dr. Statz's testimony, when the district court asked whether he wanted a mistrial, Janis

stated he wanted to continue with the trial that already had begun. After reviewing the evidence presented, we conclude any potential error committed in excluding Dr. Statz was "harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967).

## C. Fingerprint Expert

We review the district court's decision to admit expert testimony for abuse of discretion. United States v. Hernandez, 299 F.3d 984, 991 (8th Cir. 2002). Janis argues the district court erroneously admitted unnoticed expert testimony without a preliminary reliability determination and assumed the mantle of an advocate to help the government prove its case. The district court permitted a fingerprint expert to testify about matching fingerprints from a 1987 felony conviction for "Dean Janis" and fingerprints taken when Janis was arrested in this case.

"Fingerprint evidence and analysis is generally accepted." United States v. Collins, 340 F.3d 672, 682 (8th Cir. 2003). In Hernandez, we concluded the district court did not abuse its discretion in admitting a fingerprint expert's testimony. Hernandez, 299 F.3d at 991. We cited with approval United States v. Llera Plaza, 188 F. Supp. 2d 549, 575-76 (E.D. Pa. 2002), in which the district court initially rejected fingerprint expert testimony because it did not satisfy Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993), but later vacated its decision and "concluded expert testimony regarding fingerprint evidence should, subject to sufficient trial court oversight, be regarded as satisfying" the standards set out it Daubert and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). See Hernandez, 299 F.3d at 991. Scientific "theories that are so firmly established as to have attained the status of scientific law . . . properly are subject to judicial notice" under the rules of evidence. Daubert, 509 U.S. at 592 n.11. "While the principles underlying fingerprint identification have not attained the status of scientific law, they nonetheless bear the imprimatur of a strong general acceptance, not only in the expert

community, but in the courts as well." United States v. Crisp, 324 F.3d 261, 268 (4th Cir. 2003).

We conclude the district court did not err in admitting the fingerprint expert's testimony. The district court made a reliability determination of Detective Jordahl, the government's fingerprint expert. Janis did not question the reliability of the expert opinion or cross-examine the expert regarding reliability. Janis repeatedly asserts he did not have sufficient time to challenge the reliability of the government expert's opinion. The district court stated a fingerprint expert would be appointed for Janis if his attorney so requested. However, Janis rejected the district court's offer for an additional continuance to find, and have the government pay for, an expert to contradict the government's expert. Janis also rejected the court's offer for a mistrial. Janis did not challenge the reliability of the expert in closing argument, nor did he deny he previously had been convicted of a felony.

The district court noted Janis had not informed the court or the government he would seek to have the government prove his identity as a felon by anything other than judicial notice, and the government proceeded on the assumption Janis would stipulate to his identity as the same Dean Janis convicted in 1987. The district court further noted both sides had been dilatory in discovery matters. The government argued its initial discovery provided Janis with documents listing fingerprints from Janis's prior conviction that would be introduced at trial. Accordingly, the district court offered Janis a mistrial or an additional continuance in order to find an expert to contradict the government's expert, but Janis rejected both, desiring instead to proceed with the trial. See Fed. R. Crim. P. 16(d)(2)(B). We conclude the district court did not abuse its discretion in permitting the government's fingerprint expert to testify at trial, nor did the district court assume the mantle of advocate in attempting to devise a solution to the problem of how Janis's identity could be proved.

## III.  CONCLUSION

We affirm.

_____