# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3325

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Lonnie Weston, | * |
| | * |
| Appellant. | * |

_____

No. 05-1291

_____

Appeals from the United States
District Court for the
Western District of Missouri.

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Sherry Woodard, | * |
| | * |
| Appellant. | * |

_____

Submitted: November 16, 2005
Filed: March 29, 2006

_____

Before SMITH, HEANEY, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Lonnie Weston and Sherry Woodard appeal their convictions for the manufacture, possession, and distribution of methamphetamine. Weston challenges the legality under the Fourth Amendment of two searches of his home. In addition, Weston requests that the district court's alternative sentence be imposed in light of *United States v. Booker*, 543 U.S. 220 (2005). Woodard argues that insufficient evidence supported her conviction. In the alternative, Woodard asserts that the district court erred by not applying the statutory safety valve set forth in 18 U.S.C. § 3553(f). We remand Weston for resentencing in consideration of the factors set forth in 18 U.S.C. § 3553(a), and we affirm the remainder of the district court's judgments.

## I. *Background*

Law enforcement officers, including Jeff Sutherland, went to Lonnie Weston's residence to investigate reports that stolen vehicles were located there. Weston lived in a mobile home located on a state highway in rural McDonald County, Missouri. Although his property is accessible by the highway, Weston's mobile home cannot be seen from the highway. Weston's property is fenced and a gate blocks the driveway entrance near the highway. The officers admitted that it was possible that the gate was closed, but it is undisputed that the gate was not locked.

Beyond the gate, the driveway winds approximately 200 yards to a split-rail fence located between the end of the driveway and the mobile home. The mobile home is positioned perpendicular to the fence. Thus, one standing at the fence faces an end of the trailer, and the front door and articles near it are not visible from this vantage.

## A. *First Search*

The officers entered the driveway, proceeded to and parked at the split-rail fence. The officers observed many junk vehicles, but they saw no vehicles matching descriptions of those reported to be stolen. Nonetheless, the officers exited their vehicle and proceeded beyond the split-rail fence to the front door of the mobile home. The officers intended to announce their presence and ask Weston about the stolen vehicles.

As the officers approached the front door, they observed propane tanks next to the door and other tanks leaned against the split-rail fence. The officers noticed a blue discoloration on the valves of the tanks, which indicated that they had contained anhydrous ammonia, an ingredient used in the manufacture of methamphetamine. One of the tanks had been spray-painted blue in an apparent attempt to conceal the discoloration. The discovery of the tanks was consistent with Sutherland's knowledge of reports that methamphetamine had been manufactured at Weston's home. The officers testified that if methamphetamine had been recently manufactured there would have been a chemical odor but that they smelled no such odor on this day. The officers left the premises to obtain a state search warrant.

Upon searching the premises pursuant to the warrant, officers encountered several persons at the residence with personal use amounts of methamphetamine. Officers also seized physical evidence consistent with the manufacture and distribution of methamphetamine, including a methamphetamine cookbook and syringes. The evidence seized pursuant to execution of this warrant was admitted against Weston in the proceedings below.

## B. *Second Search*

Almost two years later, Officer Sutherland returned to Weston's property to serve a felony warrant on Jody Weston, Lonnie's son, who Sutherland had information might be found at Lonnie's residence. As Sutherland approached the front door, he

heard female voices talking inside the residence. Sutherland knocked on the door, announced his presence, and noticed that the conversation inside abruptly halted. He continued to knock, and several minutes later, Desa White, Jody's mother and Lonnie's ex-wife, answered the door. Sutherland asked if Jody was there, and White twice told him no. Sutherland then received consent from White to enter the premises to search for Jody. It is unclear whether Sutherland asked to go inside or if White offered. Sutherland did not ask White if she lived there or if she had the authority to consent to a search of the premises.

In searching the premises for Jody, Sutherland observed several items related to the manufacture of methamphetamine. Sutherland then left the residence and applied for a search warrant based upon what he had seen. After obtaining the warrant, officers returned to the residence and performed a more thorough search, discovering even more items indicative of the manufacture and distribution of methamphetamine. The items seized pursuant to execution of this warrant were also admitted into evidence against Weston.

## C. *Woodard's involvement*

Woodard, Weston's half-sister, lives in a mobile home on the same property as Weston,[1] located near the Sims General Store. Woodard owns and operates the store. Notwithstanding its rural location and lack of gasoline pumps, the Sims General Store sold a large quantity of pseudoephedrine pills. Charles Laffoon, the sales agent for Handi-Rak (the company supplying the store s pseudoephedrine), testified that he believed that someone was using the pseudoephedrine to manufacture methamphetamine due to the large amounts purchased. According to Laffoon, Woodard requested the maximum amount of pseudoephedrine that Laffon could sell

---

[1]Woodard's home is across the valley from Weston's. At oral argument, Woodard's counsel informed the court that the two homes were approximately 300 yards apart. Weston owns the property.

each week. Over approximately five months, Woodard ordered 41,904 60-milligram pseudoephedrine pills from Handi-Rak.

Woodard told Laffoon the large quantities of pseudoephedrine were for her personal weight loss; however, co-defendant Craig Guinn testified that Woodard was actually reselling large amounts of the pseudoephedrine to Weston at a premium price. Specifically, Guinn testified that on three separate occasions, he accompanied others[2] who obtained cases of pseudoephedrine pills from the Sims General Store. On each occasion, more than an entire case of pills was purchased. On the two occasions when Guinn personally entered the store, Woodard directed the purchasers of the pills to the back storage room where the pills were kept. Guinn further testified that Weston paid Woodard twice the normal price for the pills. On each of these three occasions, Guinn was present while Weston used the pseudoephedrine to manufacture methamphetamine.

Before trial, Weston moved to suppress the evidence seized during the two searches of his home. The district court denied both motions. With respect to the first entry, the court ruled that the officers did not invade Weston's reasonable expectation of privacy by walking to the front door of the residence to advise Weston of their presence and purpose. Once at that lawful vantage, the officers observed in plain view the incriminating bluish discoloration of the propane tanks' valves. As a result, the court concluded that their observations could be used to establish probable cause and did not trigger the exclusionary rule. With respect to the second entry, the district court held that it was reasonable for the officers to believe that White had apparent authority to consent to the search of Weston's home to look for Jody Weston and that the ensuing search did not exceed the scope of her consent. Consequently, the court

---

[2]On two occasions, Guinn accompanied Weston. On the other occasion, Guinn accompanied Rebecca Singleton, at the bequest of Weston.

held that Sutherland's observations could be used to establish probable cause for the subsequent search warrant.

A jury found Weston guilty of conspiracy to manufacture and distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, as well as possession with intent to distribute the same, in violation of §§ 841(a)(1), (b)(1)(A). The district court sentenced Weston to 360 months' imprisonment on both counts, to run concurrently in September 2004. This was the minimum sentence permitted by the then mandatory United States Sentencing Guidelines due to his status as a career offender. The district court also issued an alternative sentence of 240 months, the statutory minimum, in the event that *Blakely v. Washington*, 542 U.S. 296 (2004), was extended to the Guidelines.

The same jury found Woodard guilty of conspiracy to manufacture and distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, and conspiracy to distribute pseudoephedrine having reasonable cause to believe it would be used to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(c)(2), and 846. Woodard's offense level of 34, combined with a criminal history category of I, resulted in a Guidelines sentencing range of 151 to 188 months. After deciding that Woodard did not qualify for the statutory safety valve set forth in 18 U.S.C. § 3553(f), the district court considered the factors set forth in 18 U.S.C. § 3553(a) and determined that the statutory minimum, 120 months' imprisonment, was reasonable.

II. *Discussion*

A. *Entry into Curtilage*

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. The Fourth Amendment's protection extends to the curtilage surrounding a home. *United States v. Dunn*, 480 U.S. 294, 301 (1987). The

government concedes that the officers entered the curtilage of Weston's home. The issue, then, is whether the officers' entry was reasonable. We hold that it was, as the intrusion was limited and was reasonably necessary to further a legitimate law enforcement purpose.

"Curtilage" means "the area to which extends the intimate activity associated with the sanctity of a man s home and the privacies of life." *Oliver v. United States*, 466 U.S. 170, 180 (1984) (citation and internal quotations omitted). Where a legitimate law enforcement objective exists, a warrantless entry into the curtilage is not unreasonable under the Fourth Amendment, provided that the intrusion upon one's privacy is limited. *See United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001).

For example, in *Raines*, the officer came to the defendant's residence to serve civil process on a person reasonably believed to be present, which the court characterized as a "legitimate objective." *Id*. After getting no response at the front door but seeing several cars in the driveway, the officer believed that the inhabitants might be in the back yard enjoying the summer evening, so the officer passed through an ungated, ten-foot-wide opening in a make-shift fence to enter the yard, which the court considered to be a limited intrusion. *Id*. at 420–21. Upon entry, the officer saw marijuana plants in plain view. *Id*. at 421. The seizure of the contraband was upheld because the officer was pursuing a legitimate law enforcement objective and made a limited intrusion upon the defendant's privacy interests. *Id*.

Here, the entry of Weston's curtilage was a limited intrusion upon his privacy interests in furtherance of a legitimate law enforcement objective. The gate at the end of the driveway was unlocked and may have been open. As the officers proceeded up the driveway, they did not see any of the stolen vehicles. However, they could not see all the property, and it contained a garage. The officers intended to obtain consent to search the rest of the property, including the garage. Thus, the officers approached the front door to announce their presence, to inquire about the stolen vehicles, and to

request consent to search the remainder of the property. This tactic, commonly referred to as a "knock and talk," was a reasonable investigative technique under these circumstances. *E.g., United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001), *see also United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984) ("[N]o Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors–such as driveways, walkways, or similar passageways."). While standing at Weston's front door, the bluish discoloration on the propane tanks' valves was in plain view. Given these facts, the officers' limited, good-faith entry into the curtilage in furtherance of a legitimate law enforcement objective was not unreasonable; therefore, we affirm the denial of Weston's motion to suppress.

### B. *Apparent Authority to Consent*

The Fourth Amendment requires the police to obtain a warrant to search an individual's home, unless an established exception to the warrant requirement exists. *United States v. Leveringston*, 397 F.3d 1112, 1114 (8th Cir. 2005). Consent is a valid exception to the warrant requirement, *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973), and may be given either by the suspect or by some other person who has common authority over, or a sufficient relationship to, the premises to be searched. *United States v. Matlock*, 415 U.S. 164, 171 (1974). The government bears the burden of proving that an exception to the warrant requirement exists. *United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003); *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) ("The burden of establishing . . . common authority rests upon the State.").

In determining a third party's authority to consent, the officers must reasonably believe that, given the totality of the circumstances, the third party possesses authority to consent. *Rodriguez*, 497 U.S. at 186; *United States v. Pennington*, 287 F.3d 739, 746–47 (8th Cir. 2002) (stating that "[t]he critical facts . . . are not the actual relationship between the consenter and owner, but how that relationship appears to the officer who asked for consent." (citation and internal quotations omitted)). The

ultimate determination of reasonableness is a question of law that this Court reviews de novo. *United States v. James*, 353 F.3d 606, 615 (8th Cir. 2003). "On review, we ask this question: would the facts available to the officer at the time the consent is given warrant a person of reasonable caution in the belief that the consenting party had authority over the item to be searched?" *Id.*

Given the facts of this case, we hold that Officer Sutherland's belief that White had authority to consent to the search of Lonnie Weston's home was reasonable. Sutherland knew that White and Lonnie Weston had been married and had a child together—Jody Weston—the subject of his inquiry. Sutherland also knew that Weston and White remained close despite their divorce. In fact, this was the third time in four years that Sutherland had seen White at Weston's home. Weston was not home, but White was in the house with other people. Looking for Jody, Sutherland went to Jody's father's house, and Jody's mother answered the door. White allowed Sutherland to search the premises for Jody. Consequently, Sutherland could have reasonably believed that White had authority to consent based upon her having a sufficient relationship to either the premises or Weston.

## C. *Sentencing Error as to Weston*

Because we have held that the searches of his home were reasonable, Weston is not entitled to a new trial. However, Weston also raised a sentencing issue below based upon *Blakely v. Washington*, 542 U.S. 296 (2004). Weston, sentenced under the mandatory Guidelines, requested an alternative sentence in the event that *Blakely* was extended to the federal Sentencing Guidelines. Weston thus preserved his allegation of error under the subsequent holding of *United States v. Booker*, 543 U.S. 220 (2005). *See United States v. Pirani*, 406 F.3d 543, 549–50 (8th Cir. 2005) (en banc). Therefore, we review his sentence for harmless error. *United States v. Cullen*, 432 F.3d 903, 906 (8th Cir. 2006).

The government bears the burden of proving that the error was harmless, which requires the government to demonstrate that the district court would have ordered the same sentence if the Guidelines were advisory. *United States v. Ellis*, 417 F.3d 931, 933 (8th Cir. 2005). In this case, the government concedes that the district court ordered an alternative sentence of 240 months' imprisonment if the Guidelines were later held advisory. After sentencing Weston to the 360-month minimum sentence under the Guidelines, the district court stated

> If I were freed of the strictures imposed by the sentencing guidelines, this is the case in which I would impose the mandatory minimum sentence of 20 years. So if this case should come back to me for resentencing [sic] and if the guidelines are discretionary at that time, that would be the sentence that I would impose.

(Sentencing Tr. at 14). The district court announced its alternative sentence without applying the sentencing factors set forth in 18 U.S.C. § 3553(a).

Given the district court's definitive statements, the government cannot show that the mandatory application of the Guidelines was harmless error. The issue then becomes the appropriate remedy—whether to impose the alternative sentence or whether to remand for re-sentencing. Post-*Booker*, the calculation of the Guidelines range represents the "critical starting point." *United States v. Thomas*, 422 F.3d 665, 669 (8th Cir. 2005); *see also United States v. Haack*, 403 F.3d 997, 1002–03 (8th Cir. 2005). The district court may then exercise its discretion to impose a sentence within or outside of the Guidelines range by taking into account the factors set forth in § 3553(a). *Thomas*, 422 F.3d at 669. Based upon the record before us, we cannot tell whether the district court properly considered the § 3553(a) factors in reaching its alternative sentence. We, therefore, remand for consideration of those factors.

-10-

D. *Sufficiency as to Woodard*

Woodard contends that there was insufficient evidence to support her convictions for conspiracy to manufacture and distribute methamphetamine and conspiracy to distribute pseudoephedrine. "We review the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Sheikh*, 367 F.3d 756, 761 (8th Cir. 2004).

"To convict a defendant on a conspiracy charge, the jury is required to find that 1) an agreement existed among two or more people to accomplish an illegal purpose, 2) the defendant knew of the conspiracy, and 3) the defendant knowingly joined and participated in the conspiracy." *United States v. Hayes*, 391 F.3d 958, 961 (8th Cir. 2004). A defendant's agreement to enter a conspiracy does not have to be explicit, but can consist of a tacit or implicit understanding. *United States v. Kessler*, 321 F.3d 699, 702 (8th Cir. 2003). Woodard concedes that there was a conspiracy between Weston and others. Thus, the decision turns upon the second and third elements. As discussed below, there was substantial evidence that Woodard knew of and knowingly joined both conspiracies for which she was convicted.

i. *Conspiracy to Distribute Pseudoephedrine*

The testimony of Craig Guinn provides substantial evidence that Woodard knew of and knowingly joined the conspiracy to distribute pseudoephedrine. On three occasions, Guinn accompanied others who obtained cases of pseudoephedrine pills from the Sims General Store owned and operated by Woodard. Weston then used the pills to manufacture methamphetamine. On two of those occasions, Guinn witnessed Woodard tell the pill s purchasers where the pills were kept within the store—in a back room, not on the shelf. Guinn testified that Weston paid Woodard twice the retail price for these pills.

-11-

The testimony of Charles Lafoon further shows Woodard's knowing involvement in the conspiracy to distribute pseudoephedrine. Despite the rural location of the Sims General Store, Woodard asked Lafoon to sell her the maximum quantity that he could lawfully sell each week. Woodard explained the large quantity by claiming that she was using the pseudoephedrine for her personal weight loss, which was false in light of Guinn's testimony that the pills were being sold to Weston by the case. Lafoon believed that someone was using the pseudoephedrine to manufacture methamphetamine.

In light of the testimony of Guinn and Lafoon, a reasonable jury could have concluded that Woodard knew of and knowingly joined a conspiracy to distribute pseudoephedrine for use in the manufacture of methamphetamine. *United States v. Bewig*, 354 F.3d 731, 736 (8th Cir. 2003).

ii. *Conspiracy to Manufacture and Distribute Methamphetamine*

Relying on the Supreme Court's decision in *United States v. Falcone*, 311 U.S. 205 (1940), Woodard asserts insufficient evidence supported her conviction for conspiracy to manufacture and distribute methamphetamine. In *Falcone*, the defendants sold sugar, yeast, and cans with knowledge that the materials would be used in illicit distilling operations. *Id*. In affirming the reversal of the defendants' convictions for conspiring to violate the revenue laws, the Court held that knowledge of the purchasers' illegal activity, standing alone, did not support an inference of the sellers' knowledge of any conspiracy among the purchasers. *Id*. at 210. In essence, *Falcone* holds that the supplier of goods used for an illegal purpose must have had knowledge of the conspiracy to illegally use the goods. *Valentine v. United States*, 293 F.2d 708, 712 (8th Cir. 1961).

There was sufficient evidence that Woodard knew of the conspiracy to manufacture and distribute methamphetamine and knowingly joined this conspiracy. On cross-examination, Woodard admitted that she informed Officer Sutherland of her

suspicions that Weston was manufacturing methamphetamine. At the same time, despite her suspicions, Woodard supplied Weston with wholesale quantities of pseudoephedrine at a premium price. The cases of pseudoephedrine were not purchased from the shelves of the Sims General Store but were kept in the back room of the store, awaiting purchase by Weston or his agents. Furthermore, Woodard purchased other methamphetamine precursors, including ten gallons of Coleman fuel and six lithium batteries, from Wal-Mart. Although Woodard contends that she purchased these items for resale in the store, the jury could have reasonably concluded that the purchase of these items indicated a deeper involvement in the conspiracy to manufacture methamphetamine than merely supplying large quantities of pseudoephedrine.

In addition, Weston and Woodard are half-siblings living on the same property in a small rural community. Although their homes were not close together, the jury could have reasonably inferred that the pungent odor, a by-product of the anhydrous ammonia method of manufacturing methamphetamine used by Weston, was noticeable at Woodard's home. Moreover, Woodard purchased the Sims General Store from Rick Brassfield fourteen days after Brassfield's arrest. Prior to his arrest, Brassfield used the Sims General Store to obtain pseudoephedrine to manufacture methamphetamine with Weston.[3]

Finally, given the highly regulated nature of pseudoephedrine, Woodard's repeated bulk sales to the same individuals rather than to businesses or professionals are inconsistent with innocent sales of common consumer products. On this record, the jury could have reasonably believed that Woodard realized that the pseudoephedrine she sold would be used to manufacture methamphetamine and

---

[3]Indeed, Brassfield's methods were very similar to Woodard's: he would order large quantities of pseudoephedrine and never place them on the shelves, electing to keep them in the storage room until used by Weston to manufacture methamphetamine.

agreed with the purchasers and others to manufacture and distribute methamphetamine.

E. *Sentencing as to Woodard*

Woodard argues that the district court's refusal to utilize the "safety valve," set forth in 18 U.S.C. § 3553(f), violates the holding of *United States v. Booker*, 543 U.S. 220 (2005). Specifically, she alleges that the United States Sentencing Guidelines Manual remains mandatory within the context of § 3553(f).

Woodard's argument presents an issue of first impression for this Circuit. However, we need not decide the constitutional question because Woodard does not qualify for the safety valve. Section 3553(f) provides that "[n]otwithstanding any other provision of law, in a case of an offense [under certain portions of the Controlled Substances Act], the court *shall impose* a sentence pursuant to the guidelines promulgated by the United States Sentencing Commission . . . without regard to any statutory minimum sentence, if the court finds at sentencing" that five elements are satisfied. (emphasis added). The fifth necessary element, contained in § 3553(f)(5), requires the defendant to truthfully provide to the government all information that she has concerning the offense. Woodard did not satisfy this element. The jury did not believe Woodard's trial testimony. Likewise, at the sentencing hearing, the district court expressed its disbelief of Woodard's trial testimony and ultimately concluded that Woodard had not been truthful with either the court or the government. As a result, we find no error in the district court s refusal to grant Woodard relief under the safety valve provision.

III. *Conclusion*

We remand Weston's case for re-sentencing in consideration of the factors set forth in § 3553(a). As for the remaining allegations of error, we affirm. The entry into the curtilage of Weston's home was not unreasonable under the Fourth Amendment because the entry was a limited invasion of his privacy in furtherance of a legitimate

-14-

law enforcement objective. With respect to the other contested entry, the officer could have reasonably believed that the third party had authority to consent to a search of Weston's home. Sufficient evidence supported Woodard's involvement in the two conspiracies for which she was convicted. Finally, Woodard failed to satisfy a necessary element of the safety valve by not being truthful with the government as required by § 3553(f).

_____