# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2602

_____

United States of America,                    *
                                              *
        Plaintiff - Appellee,                 *
                                              *
v.                                            *
                                              *
Porfirio Almeida-Perez, also known as         *
Javier Medina-Rios,                           *
                                              *
        Defendant - Appellant.                *


_____

No. 07-2635

_____

Appeals from the United States
District Court for the Western
District of Missouri.

United States of America,                    *
                                              *
        Plaintiff - Appellee,                 *
                                              *
v.                                            *
                                              *
José Almeida-Perez, also known as             *
José Alvaro-Lara,                             *
                                              *
        Defendant - Appellant.                *

_____

Submitted: February 12, 2008
Filed:  December 16, 2008

_____

Before WOLLMAN, JOHN R. GIBSON, and SHEPHERD, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

José and Porfirio Almeida-Perez, brothers who pled guilty to being illegal aliens in possession of firearms that had been transported in interstate commerce, 18 U.S.C. § 922(g), appeal from the district court's denial of their suppression motion and from the twenty-four month sentences it imposed on each of them.  The Almeidas contend that the district court erred in finding that police reasonably relied on the real or apparent authority of their cousin Sergio Almeida-Alvarez to consent to police entry of the Almeida house.  They also contend that the district court erred in finding that the other occupants of their house consented to police entering José's and Porfirio's bedrooms.  They challenge the district court's credibility determinations, which they contend rest on mutually inconsistent findings.  Finally, they challenge the district court's determination at sentencing that they possessed the firearms in connection with possession of cocaine.  We affirm the district court's denial of the suppression motion, but  we remand for  clarification of  the findings at sentencing.

Our recitation of the facts is complicated by the problem that the testimony at the suppression hearing varied at almost every important particular, depending on whether the witness was called by the prosecution or defense.  Therefore, we will tell the story several times in order to fairly present the scenario faced by the Magistrate Judge who heard the testimony in this case.

Kansas City, Missouri police detective Luis Ortiz was the principal actor on the police side of this case by virtue of the fact that he was the only officer involved who was fluent in Spanish. Before the date of the entry at issue here, July 6, 2006, police had received a report from a confidential informant that a Hispanic male called "Sinaloa" was selling drugs out of the house at 5115 East 22nd Street in Kansas City and that he had weapons. Ortiz had surveilled the house on July 5 and 6 and had seen people going in and out of the house. Ortiz and Tracy Raggs, an Immigration and Customs Enforcement agent, decided to go up to the house for a "knock and talk," in other words, to see if they could investigate by consent of the suspects.

Ortiz and Raggs walked up to the house, where Sergio Almeida was sitting on the front porch. Ortiz said that he introduced himself and Raggs, explained that they were conducting a narcotics investigation, and asked if they could "talk about it inside." Ortiz said that during surveillance, he had seen Sergio going in and out of the house, but he did not ask Sergio whether he "had any interest in the house." According to Ortiz, Sergio "was very cooperative, and he invited us inside the residence." Sergio walked into the house without knocking, and Ortiz and Raggs followed him in, their sidearms still in the holsters.

Inside the house they found three or four people in the living room. Ortiz explained in Spanish who he and Raggs were and why they were there. Ortiz asked if there was anyone else in the house. Raggs testified that the person who answered this question was Maria Juarez-Galaviz, Porfirio's wife, and that she said her husband Porfirio was in a bedroom, and she gestured toward it. Ortiz testified that "they" (the people in the living room) gestured toward the northeast bedroom and said Porfirio was there, then toward the west bedroom and said that José and Maria (Almeida-Perez, teenaged sister to Jose and Porfirio) were in that room. Ortiz said that he asked them "if I could knock on the door and see if they wanted to come outside, if it was okay that I could go and knock on the door and call them to the living room," and that

they said yes. Raggs, who spoke little Spanish, said that Ortiz asked Maria if he could go in the bedrooms, and Maria said yes.

While Raggs stayed with the family in the living room, Ortiz went to Porfirio's room, knocked on the door, identified himself as police, and then opened the door. When Ortiz opened the door, he saw a black shotgun next to the bed where Porfirio was sleeping. Ortiz asked Porfirio to come out to the living room, which he did. Ortiz radioed for another officer, Detective Michael Miller, to come as backup. Ortiz and Miller then went to the other bedroom, knocked, and identified themselves as police. Ortiz opened the door and saw Maria Almeida-Perez on the bed and José asleep on the floor with a rifle at his side. On cross-examination, Ortiz admitted that he entered both bedrooms. He asked José and Maria to come to the living room, which they did.

Once all the occupants of the house were gathered in the living room, Ortiz told them that the police were conducting a narcotics investigation and that Immigration and Customs Enforcement was involved because the police had information that there were illegal aliens there. He asked who was responsible for the house and was told that Porfirio, Maria Juarez, and José were. He also asked for permission to search the house for narcotics, weapons, and currency, and the three said that they had no problem with that. Ortiz produced a consent to search form written in English and explained to the three of them in Spanish that it was up to them whether to give permission to search the house. They all signed the consent form. Ortiz testified that during this conversation, the occupants of the house were sitting in the living room, mostly along the east wall, some in chairs and some on the floor. Ortiz said that neither he nor Raggs had their guns drawn.

With the permission of the occupants, Ortiz called in still more officers and began the search. He asked if there were any narcotics in the house and Porfirio answered that there was some cocaine. Porfirio looked around for some cocaine, but

could not find it; he commented that everybody in the house used cocaine, so someone probably had used the cocaine he was looking for.

Raggs said that during the search, he stayed in the living room, talking to the occupants of the house about their immigration status. He said that they were "very cooperative" and that he and the occupants were "just kind of joking" and "talking about all kinds of stuff." Raggs said that he did not have his gun drawn, the occupants were not handcuffed or arrested, and he did not ask them to face the wall. Raggs said he asked Porfirio, José, and the others in Spanish whether they had entered this country legally or illegally; they answered, "Ilegal."

The search produced the two guns already mentioned, as well as one other shotgun found up in the attic, $19,353 in cash, and less than a gram of cocaine, which was found inside a shoe in José's room. After the search, the police moved the family out to the back yard so the police could bring in a drug-sniffing dog, which alerted to the cash, indicating that it smelled of cocaine.

In contrast to the congenial atmosphere described by Ortiz and Raggs, the scene described by the Almeida family was one of strife and coercion. Sergio Almeida testified that he was visiting at his cousins' house on July 6 when two police officers walked up; he was told (not asked) to go inside, which he did without asking permission from the people who lived there. They went into the living room, where they met Vinancio Almeida and Urbana Perez, parents of Porfirio; Maria Juarez, Porfirio's wife; and Manuel Perez, Porfirio's uncle. Sergio said that Ortiz told them to line up against the wall, to put their hands on the wall, and not to move. The police frisked them. The police did not have their guns drawn, but they had their hands on their weapons. According to Sergio, the officers did not ask permission to go get Porfirio and José or to search the house. Sergio recounted that another officer went into Porfirio's room with Ortiz and that the officer had his gun out and was pointing

it ahead of him. Sergio heard the police ask Porfirio if he had any drugs, and Porfirio answered that he did have some for personal use.

Maria Juarez, Porfirio's wife, also testified that the police came in and told the family that they had information that there were guerillas there. She said the police made them line up against the wall with their hands up. The police took their guns out and pointed them at the family. She said Ortiz and another officer entered Porfirio's bedroom without asking anyone's permission and that Ortiz had his gun drawn and pointed it at Porfirio. Maria Juarez said there were ten officers in the house and that while the family were lined up in the living room, one officer was swinging a baseball bat menacingly for ten minutes. She said that she was not allowed to talk to her husband during the search, which went on for three hours. She also said no one asked for permission to search the house before they began, but she signed a form after the police were done with the search because the police told them if they did not sign it, they would all be arrested. She did not understand the form because it was in English, and no one ever told them that they had a right to withhold permission to search the house. However, she also testified that the family all admitted to the immigration officer that they were in the country illegally, and yet Ortiz told them that "there was no problem. That they weren't going to take us." Maria Juarez recounted that Ortiz had asked Porfirio if he had any drugs, and Porfirio said he had some for personal use.

The story of Urbana Perez-Lopez, Porfirio and José's mother, was similar to Maria Juarez's story. Urbana testified that one officer was waving a stick at Maria Juarez and threatening her with it; that Urbana had to stand facing the wall for more than an hour; that the police never asked for permission to search until they were almost finished with the search; and that they told Porfirio and Maria that if they did not sign the consent form, the whole family would be arrested. However, Urbana said, on examination by the court, that as soon as the officers came in the house with

Sergio, "they said we're not going to take you all" and that they were not going to arrest them despite their illegal immigration status.

Maria Almeida-Perez, José and Porfirio's teenaged sister, told a somewhat different story. She said that she woke up to see a black man with a gun waking up her brother. (She later referred to Officer Raggs as "the black guy from immigration.") She said that Ortiz was also there and that he pointed a gun at the bed where she was lying. She said she had never seen the rifle in her bedroom until the police found it that day. Maria Almeida said the family were made to stand with their hands against the wall and that they were inside the house for about a half-hour before the police moved them outside. She never saw an officer with a bat, but the officers, including Raggs, pointed guns at the family so that they would not move. She said that when Ortiz asked Porfirio if there were drugs in the house, Porfirio said no. She denied ever being told that the family would not be taken into Immigration, and in fact she said they were told they were going to be taken into immigration.

Porfirio testified. He said no one asked whose house it was until the search was accomplished. He said that the gun in his room was not visible to anyone who was not standing inside the room. He said that when Ortiz asked him if he had drugs in the house, he replied no, but he later admitted that he tried to show the police where a small quantity of drugs was located. Porfirio saw an officer with a bat, but he never saw him waving it. He said that the officers told him the day of the search that they were not concerned that the whole family was in the country illegally and that there was "no problem with that." However, he also said that the next day when he was in custody, Ortiz threatened him that if he did not sign a Miranda consent form, Ortiz would arrest the family for "conspiracy."

The defendants called one police officer as a witness. Kansas City Police Department detective Michael Miller testified that he assisted with the "knock and talk," and that he came into the house to assist Raggs and Ortiz in maintaining control.

-7-

He said the family were seated on a couch with a few of them along the wall opposite the couch. He did not remember seeing them facing the wall with their arms up. He helped with the search after Ortiz told him that they had permission to search. His best guess was that the family were inside the house about thirty minutes before going out to the back yard. He never saw anyone waving a bat at the occupants of the house. He said it was possible he had his gun drawn, but it probably would have been pointed at the ground.

Porfirio and José both waived their Miranda rights in custody and gave statements. Porfirio admitted having provided the cocaine to his brother, and José admitted the cocaine belonged to him. Porfirio said the guns belonged to him, but José said he had handled one of the firearms when showing it to a friend and that after the friend's visit, the rifle was left in his room. Porfirio and José both said the guns were used for hunting rabbits at a ranch. Both admitted that they were in the United States illegally. Both were charged with possession by an illegal alien of firearms that have been transported in interstate commerce.

Porfirio and José moved to suppress the results of the search. After hearing the testimony outlined above, the Magistrate Judge made a report and recommendation including extensive findings of fact generally accepting the police officers' story and rejecting as incredible the testimony of the various members of the Almeida family. The Magistrate Judge found as follows:

(1) When the officers approached Sergio, having seen him going in and out of the house during surveillance, they asked Sergio to take them inside and "Sergio Almeida-Alvarez was very cooperative and he invited the officers inside the residence." Sergio entered the house without knocking.

(2) When Ortiz and Raggs entered the house, they did not have their guns drawn. When they encountered three or four family members in the living room, Ortiz identified himself and explained why he was there. The family members "motioned towards the bedrooms" and said that Porfirio was in one and José and

-8-

Maria Almeida in the other. Ortiz asked if he could knock on the bedroom door and Maria Juarez said, "Yes." Ortiz obtained her permission to go into the bedrooms to get the occupants and bring them to the living room. Only Ortiz proceeded to Porfirio's room, where he knocked and opened the door. Ortiz saw a shotgun in plain view "immediately upon stepping into the room." After seeing the gun, he called Detective Miller to come in and help. Ortiz then proceeded to the west bedroom, and again he knocked and opened the door. He saw Maria Almeida on the bed and José asleep on the floor next to a rifle.

(3) When the family were assembled in the living room, Ortiz explained that he was conducting a narcotics investigation. All the family were sitting in chairs or on the floor in the living room, against a wall. Ortiz asked who was responsible for the house, and he was told that Porfirio, his wife Maria Juarez, and José lived there. Ortiz asked for permission to search the house for narcotics, weapons, and currency. "Porfirio, José and Maria showed a desire to cooperate, said they had nothing to hide, and stated that they did not have any problem with the officers searching the residence." Ortiz produced a consent to search form, explained what it was, and told the three residents that they did not have to give consent or sign the form if they did not want to. Porfirio, Maria Juarez, and José signed the form.

(4) Ortiz said he wanted to bring in more police to conduct the search, and the residents said that was okay. Ortiz asked Porfirio if there were drugs in the house and Porfirio replied there was some cocaine. However, Porfirio was not able to locate the cocaine, and he told Ortiz that everyone in the house used cocaine, so someone had probably used it up.

(5) "At no time did Porfirio, José, or Maria refuse to consent to the search or object while the search was taking place. Instead, they were very cooperative. No officer made any threats or promises . . . ." (record citations omitted). The entire incident took about one hour.

The Magistrate Judge discussed at length the ways in which the family members' testimony differed from his findings, and he set out his reasons for rejecting

the family members' version of events. For instance, the Magistrate Judge gave a list of twelve reasons for rejecting the credibility of Sergio, seven reasons for rejecting the testimony of Maria Juarez, and eight reasons for rejecting the testimony of Urbana Perez. Some of these reasons were internal conflicts within the same witness's testimony, some were conflicts between one family member's testimony and another's, and some were implausibilities in the family members' stories. Additionally, in his discussion of each family member's credibility, the Magistrate Judge listed prominently that the person in question was "in the United States illegally." For instance, in his discussion about Urbana Perez, the Magistrate Judge stated, "Ms. Perez-Lopez is in the United States illegally. Her willingness to break the law in that respect diminishes her credibility."

In conclusion, the Magistrate Judge held that the defendants voluntarily consented to the search of their residence, and therefore he recommended denial of their motion to suppress.

The district court reviewed the record de novo and adopted and affirmed the Magistrate Judge's findings. In particular, the district court cited the conflicts between the testimony offered by the defendants, the internal inconsistencies in particular witnesses' testimony, and the "general unreasonableness" of their testimony. The court rejected the story of coercion and threats: "In short, the Court does not believe the officers implicitly threatened the occupants with a baseball bat." The court specifically found that the officers had reason to believe that Sergio Almeida had the authority to allow entry into the house and that the officers received voluntary consent before searching the house.

Porfirio and José entered agreements to plead guilty to being an illegal alien in possession of firearms. The agreements specifically preserved the Almeidas' rights to appeal the denial of their suppression motion and certain sentencing issues,

including whether they should receive an enhancement of their offense level under the Sentencing Guidelines for possessing the firearms in connection with another felony.

The district court accepted their pleas. At the sentencing hearing, the district court found that both the Almeidas should receive a four-level enhancement of their sentencing offense levels under USSG § 2K2.1(b)(6) for possessing the firearms with knowledge, intent, or reason to believe that they would be used or possessed in connection with another felony. Each defendant was sentenced to twenty-four months' imprisonment and three years' supervised release.

I.

Under the Fourth Amendment,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

Generally, the Fourth Amendment requires the police to obtain a warrant before entering a home. Payton v. New York, 445 U.S. 573, 590 (1980). Where, as here, the police have entered a defendant's house without a warrant, the burden is on the prosecution to prove that the police acted pursuant to a valid exception to the warrant requirement. United States v. Weston, 443 F.3d 661, 667 (8th Cir. 2006). One such exception is consent. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). The police may enter and search a defendant's house with the voluntarily given consent of the defendant or with the consent of a third party who shares "common authority over the premises or effects" to be searched, United States v. Matlock, 415 U.S. 164, 170 (1974), provided that the defendant does not object, see Georgia v. Randolph, 547

U.S. 103, 122-23 (2006); United States v. Hudspeth, 518 F.3d 954, 960-61 (8th Cir. 2008) (en banc) (holding that defendant must be physically present to overrule third-party's consent). Even if the police make a mistake of fact about the third party's authority over the premises, the search will be legal if the circumstances lead the police reasonably to believe that they have the consent of a third party with common authority. Illinois v. Rodriguez, 497 U.S. 177, 184-86 (1990).

This case raises two questions of third party consent: did the police have sufficient reason to believe that Sergio Almeida had authority to consent to their entry of the house? And did they have sufficient reason to believe that the Almeida family members in the living room had authority to consent and in fact consented to their entry of the bedrooms where José and Porfirio were sleeping with their guns at their sides?

In the appeal from a suppression ruling, we review for clear error the questions of historical fact, such as who said what. See Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Elam, 441 F.3d 601, 603 (8th Cir. 2006). Whether the third party expresses consent is a question of fact. See Iron Wing v. United States, 34 F.3d 662, 665 (8th Cir. 1994); see also United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001) ("The determination of whether Jones expressed consent is a question of fact, which we review for clear error."). Whether the consenter had common authority over the premises is also a question of fact and is determined by the existence of "mutual use, joint access, and control." United States v. James, 353 F.3d 606, 613 (8th Cir. 2003). However, whether the reliance by police on indicia of common authority was reasonable is a question of law that we review de novo. Id. at 615; Weston, 443 F.3d at 668.

The question on entry of the house is whether police could have reasonably concluded that Sergio Almeida had authority to let them in the house because (1) they had seen him going in and out of the house during surveillance, (2) he was sitting on

the porch when they arrived, (3) he invited them inside without indicating that he had no authority to do so, and (4) he preceded them into the house without knocking or asking permission of anyone.

In <u>Illinois v. Rodriguez</u>, 497 U.S. 177 (1990), the Supreme Court held that a warrantless entry of a house might be reasonable, even though the occupant did not consent to the search, if "the facts available to the officer at the moment . . . [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises[.]" <u>Id.</u> at 188 (internal quotation marks omitted). The Court put some responsibility on the officer to assess the situation critically: "Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." <u>Id.</u> Nevertheless, police are entitled to draw the usual inferences from what they see and hear, even though further inquiry might prove the inferences wrong. In <u>Georgia v. Randolph</u>, 547 U.S. 103 (2006), Justice Souter considered it legitimate for police to rely on the "common understanding" of the meaning of the facts they encounter:

> When someone comes to the door of a domestic dwelling with a baby at her hip, as Mrs. Graff did [in <u>United States v. Matlock</u>, 415 U.S. 164 (1974)], she shows that she belongs there, and that fact standing alone is enough to tell a law enforcement officer or any other visitor that if she occupies the place along with others, she probably lives there subject to the assumption tenants usually make about their common authority when they share quarters.

<u>Id.</u> at 111. The Court in <u>Randolph</u> recognized that the police cannot rely on the assumption that the people in a particular household hew to conventional arrangements when atypical "specialized tenancy arrangements" should be apparent from what they see and hear. 547 U.S. at 110.

Some circuits have interpreted these precedents to require police to go behind appearances to verify third party authority. See, e.g., United States v. Cos, 498 F.3d 1115, 1128-31 (10th Cir. 2007); United States v. Whitfield, 939 F.2d 1071, 1074-75 (D.C. Cir. 1991). Our circuit precedent, however, has been more liberal about allowing police to form their impressions from context. For instance in Iron Wing v. United States, 34 F.3d 662, 665 (8th Cir. 1994), we held police acted permissibly in letting the defendant's sister-in-law admit them to his house, even though she had no key and had to crawl in the window. They were entitled to rely on her statement that she lived at the house and had left her bedroom window unlocked, which was corroborated when she was able to open that window. In Weston, the defendant's ex-wife was at his trailer when he was not there; we held the police could rely on the appearance that she was in charge. 443 F.3d at 668. Similarly, in United States v. Janis, 387 F.3d 682, 687 (8th Cir. 2004), police did not violate the Fourth Amendment where a friend of the defendant entered the house without knocking, gestured for the police to follow her in, and referred to a room as "her room." We held, "The officers in this case had no reason to doubt Albert's authority to invite them into the house." Id. In United States v. Pennington, 287 F.3d 739, 746 (8th Cir. 2002), a man named Vickery was in Pennington's house; when a police officer asked about a Crown Royal bag, Vickery tossed the bag to him and he looked inside and found drugs. We held that the policeman was entitled to infer from Vickery's exercise of dominion over the bag that it was his bag. Id. at 747. Our cases suggest that where a person exercises privileges that would only be proper for an occupant of the house, the police may draw the inference that the person is indeed an occupant unless there are other circumstances that would cause a reasonable man to doubt the validity of that inference. This precept is consistent with the reasoning of Randolph and Rodriguez, that "it would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent." Randolph, 547 U.S. at 122 (discussing Rodriguez).

-14-

Here, the Magistrate Judge found that Sergio Almeida had been seen going into and out of the house without knocking, he was reposing on the front porch, he invited the officers in without asking anyone's leave, and he preceded them in without knocking. At least three of these four gestures would only be appropriate for someone who had been granted the freedom of the dwelling, as Sergio implicitly admitted when he said at the suppression hearing that he "should have asked for permission to enter the house." On the historical facts as found by the Magistrate Judge, there were no countervailing facts that should have alerted the police that Sergio Almeida was not in fact an inmate of the house. It follows that the police reasonably relied on Sergio Almeida's apparent authority to admit them to the house.

Once in the house, Ortiz's entry of the bedrooms poses a separate problem of consent and authority to consent. Where a third party appears to have authority over the entire premises, the police may rely on that person's consent to search throughout the house, so long as the consent appeared to extend so far. See Florida v. Jimeno, 500 U.S. 248, 251-52 (1991). On the other hand, if part of a dwelling is appropriated for the exclusive use of one occupant, other inmates of the house have no right to consent to police entry of the space from which they themselves are excluded. "To the extent a person wants to ensure that his possessions will be subject to a consent search only due to his own consent, he is free to place these items in an area over which others do not share access and control, be it a private room or a locked suitcase under the bed." Randolph, 547 U.S. at 135 (Roberts, C.J., dissenting). Regardless of whether the putative consenter actually has the right to enter an area within the house, the police are allowed to rely on facts that would convince a person of reasonable caution that the consenter has such authority. For instance, in United States v. Elam, 441 F.3d 601, 604 (8th Cir. 2006), police obtained consent to enter an apartment from Squire, who rented the apartment, and then relied on her consent and the key she supplied to search a locked cabinet. The police were entitled to rely on Squire's apparent authority over the cabinet in accepting her consent to the search. They were not obliged to inquire about who owned the cabinet or its contents. Id.; see also

United States v. Hilliard, 490 F.3d 635, 639-40 (8th Cir. 2007); United States v. Hinkle, 456 F.3d 836, 840-41 (8th Cir. 2006). But if the police encounter circumstances that would put them on notice of limited authority, they may not ignore such signals. See Randolph, 547 U.S. at 112 (a child of eight might have the power to admit visitors to the family foyer, but obviously not to allow them to rummage through his parents' bedroom).

In the same vein, certain relationships between the occupants may give rise to the presumption that one has authority to consent to search of the other's property. For instance, in United States v. Wright, 564 F.2d 785, 790 (8th Cir. 1977), where the defendant was an adult living with his mother, the mother had authority to consent to the search of his dresser. In United States v. Clark, 409 F.3d 1039, 1044 (8th Cir. 2005), police reasonably relied on a wife's permission to search a closet in which the wife reported that the defendant often hid things; nothing in the circumstances showed that the defendant had exclusive access to the closet. The Seventh Circuit has held that "a spouse presumptively has authority to consent to a search of all areas of the homestead; the nonconsenting spouse may rebut this presumption only by showing that the consenting spouse was denied access to the particular area searched." United States v. Duran, 957 F.2d 499, 505 (7th Cir. 1992). It would be more accurate to say that the nonconsenting spouse must show that police had reason to know the area or container was off-limits to the consenting spouse.

In this case, the testimony of Raggs supported the Magistrate Judge's finding that Maria Juarez gave permission to enter the bedrooms. It was reasonable for Ortiz to rely on the words and gesture of Maria Juarez, the proprietress of the house and the wife of Porfirio, to conclude that he was authorized to push the doors open and step in the rooms in order to communicate with the people inside. The district court's legal conclusions in denying the suppression motion were sound.

The Almeidas attack not only the district court's legal conclusions about the reasonableness of consent, but also the credibility determinations underlying the Magistrate Judge's findings of historical fact. Where, as here, the district court adopted the Magistrate Judge's findings, we review those findings for clear error. United States v. Olivera-Mendez, 484 F.3d 505, 512 (8th Cir. 2007); United States v. Spotts, 275 F.3d 714, 718 (8th Cir. 2002).

Review for clear error requires a specific level of deference to the fact-finder's views: where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous. United States v. Tucker, 243 F.3d 499, 506 (8th Cir. 2001) (discussing Anderson v. City of Bessemer City, 470 U.S. 564 (1985)). Credibility findings receive an even higher level of deference. Id. Nevertheless, credibility findings can be clearly erroneous if they are internally inconsistent. Id.

The Almeidas argue that the Magistrate Judge's findings are internally inconsistent because he discredited the testimony of the various members of the Almeida family on the ground that their stories were inconsistent with each other, yet he accepted as true some of their statements, such as Porfirio's statement to the police that everyone in the house used cocaine. The Magistrate Judge was not obliged to accept or reject each witness's testimony in its entirety, and the Almeidas do not identify any instance in which the Magistrate Judge both accepted and rejected the same statement. The Magistrate Judge did point to inconsistencies among witnesses' testimony, which he concluded indicated generally that the Almeida family members were gilding the lily in portraying an atmosphere of fear and coercion, but this does not mean that he had to accept one particular witness's version in order to use it to impeach the others. He simply concluded that significant variations in such details as whether or not an officer was threatening the family by swinging a baseball bat in the

small, crowded living room suggested fabrication of the episode. We see no internal inconsistencies rendering the findings of fact clearly erroneous.

## III.

Embedded in the point on appeal concerning inconsistent findings of fact, we find an additional argument in Porfirio Almeida's brief. He contends that the Magistrate Judge exceeded the bounds of Federal Rule of Evidence 614(b) in examining the witnesses and that he erred in taking into account the witnesses' illegal immigration status in making credibility determinations. It is true that the Magistrate Judge engaged in sometimes extensive examination of the witnesses, including asking them about whether they entered this country legally or illegally.

As a threshold matter, we observe that the defendants did not object on either ground in the district court. While we recognize the difficulty for a litigant in objecting to actions of the judge presiding over their proceedings, it is nevertheless true that without a trial level objection, there was no opportunity for the Magistrate Judge to address the issue or correct any error into which he may have fallen. Therefore, we will review the Magistrate Judge's actions under the plain error standard, Fed. R. Crim. P. 52(b). On plain error review, we may reverse only if there is an <u>error</u> that is <u>plain</u> (meaning "obvious") which the defendant can show affected his <u>substantial rights</u>. <u>United States v. Olano</u>, 507 U.S. 725, 732-34 (1993). Once these three elements are established, we may exercise our discretion about whether to notice the error, guided by our assessment of whether the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." <u>Id.</u> at 736 (internal quotation omitted).

Federal Rule of Evidence 614(b) provides, "The court may interrogate witnesses, whether called by itself or by a party." The Advisory Committee notes qualify the rule by stating,

> The authority [of the judge to question witnesses] is, of course, abused when the judge abandons his proper role and assumes that of advocate, but the manner in which interrogation should be conducted and the proper extent of its exercise are not susceptible of formulation in a rule. The omission in no sense precludes courts of review from continuing to reverse for abuse.

We have indeed reversed where the district court's questioning tended to give the jury the impression that the court favored the government and placed the defense at a disadvantage. See United States v. Singer, 710 F.2d 431, 436 (8th Cir. 1983) (en banc). However, we recognized that the extent and manner of a judge's questioning were "matters of judgment and degree." Id. at 437. "A balancing test is used to evaluate whether in the context of the overall record the court's questions destroyed the fairness of a trial." United States v. Flying By, 511 F.3d 773, 776-77 (8th Cir. 2007). In this case we cannot say that the Magistrate Judge's questioning, if it was error, was plain error. Certainly, the fact that the suppression motion was tried to a Magistrate Judge, rather than to a jury, decreases the danger of prejudice to the defendants from the Magistrate Judge's questioning. See United States v. Blood, 435 F.3d 612, 629 (6th Cir. 2006) (judge's comment less inappropriate because made outside presence of jury). We therefore find no basis to reverse on account of the Magistrate Judge's interrogation of the witnesses.

Similarly, the Magistrate Judge's inquiry about the circumstances under which the witnesses entered this country falls short of plain error. Federal Rule of Evidence 608(b) authorizes the use of specific instances of conduct of a witness for the purpose of attacking the witness's character for truthfulness. We have found two cases in which unlawful entry into the country or other violation of immigration laws was considered admissible because relevant to truthfulness. United States v. Cardales, 168

F.3d 548, 557 (1st Cir. 1999); <u>United States v. Cambindo Valencia</u>, 609 F.2d 603, 633-34 (2d Cir. 1979).  At the same time, we must say that the use of such evidence is fraught with the danger of prejudice to a defendant by introducing the possibility of invidious discrimination on the basis of alienage.  <u>See</u> Fed. R. Evid. 403. Moreover, the relevance of an immigration violation to character for truthfulness is at the least debatable and would depend on the facts of the particular violation since many immigration violations do not involve a false statement.  <u>See</u> <u>Figeroa v. United States INS</u>, 886 F.2d 76, 79 (4th Cir. 1989) ("An individual's status as an alien, legal or otherwise, does not entitle the [Board of Immigration Appeals] to brand him a liar.");  <u>see generally</u> 3 Christopher B. Mueller & Laird C. Kirkpatrick, <u>Federal Evidence</u> § 6:33 (3d ed. 2007) (stating that Federal Rules of Evidence require link between unconvicted conduct sought to be shown and truthfulness); <u>United States v. Ndiaye</u>, 434 F.3d 1270, 1290 (11th Cir. 2006) (letter apparently proposing adulterous liaison "does not directly relate to . . . truthfulness and honesty" and therefore should not have been admitted).  Again, we conclude that if the Magistrate Judge erred, it was not plain error.  Furthermore, the Magistrate Judge's findings concerning each witness were lengthy and depended on far more than the witness's violation of the immigration laws.  We therefore cannot say that the Almeidas have shown their substantial rights were affected by any error in this regard.

IV.

Both the Almeidas contend that the district court erred in applying the four-level enhancement under USSG § 2K2.1(b)(6) for possessing the firearms in connection with the possession of cocaine.  The Almeidas argue that there was no sufficient nexus between the firearms and the drugs justifying application of the enhancement.  A firearm is possessed in connection with another felony if it facilitates that felony or has the potential to facilitate it.  USSG § 2K2.1, cmt. (n.14).  The district court relied on our case law, stating, "Let me begin by repeating the standard and that is that I have to find that it is clearly improbable that the guns were used, used

in connection with or to facilitate another felony offense. That's a very tough standard for defendants to meet." Later, the district court referred to this rule as "the law of this circuit that I'm bound by my oath to follow."

After the date of sentencing we decided United States v. Fuentes Torres, 529 F.3d 825 (8th Cir. 2008), in which we held that different rules govern the application of § 2K2.1(b)(6) in drug trafficking cases and drug possession cases. In cases in which the other felony is drug trafficking, the district court must apply the enhancement unless it is clearly improbable that the guns were possessed in connection with the drug offense. The district court apparently relied on this mandatory rule, as would have been reasonable in light of such cases as United States v. Agee, 333 F.3d 864, 866 (8th Cir. 2003) ("The enhancement must be imposed unless it is clearly improbable that [the defendant] possessed the firearm in connection with another felony offense," and saying in the same paragraph, "Regardless of whether those activities were manufacturing or simple possession or consumption, the enhancement was proper."), and United States v. Linson, 276 F.3d 1017, 1018 (8th Cir. 2002) (enhancement required where gun found in proximity to personal-use amount of marijuana and paraphernalia associated with drug trafficking). However, in Fuentes-Torres, we held that where the other felony is simple possession of drugs, the district court should apply the enhancement only if it finds the guns "facilitated" or "had the potential of facilitating" the possession offense. Id. at 828 n.2 (citing § 2K2.1, cmt. 14(A)).

Moreover, another panel of our court has recently held that the government did not prove a gun facilitated possession of a de minimis quantity of drug residue, where the defendant possessed both items within his home, rather than carrying a firearm and drugs out into the public, and there was no proof he had the gun at the same time he had a greater amount of drugs than the residue that was actually found. United States v. Smith, 535 F.3d 883 (8th Cir. 2008).

In this case, the guns were found within the defendants' home and only a personal use amount of drugs was in the house.  Counsel for the government argued at sentencing that the "clearly improbable" standard should apply even where the other felony was possession of "user amounts."  (Sent. Tr. 24) In light of  Fuentes-Torres, if these were the only facts found, the district court would have erred in applying the "clearly improbable standard."

In addition to the possession, the district court stated that the large amount of cash seized was suggestive of drug trafficking, but the record is not clear that the district court actually made a finding that the money established trafficking.  Earlier, the court had stated, "I'm not sure it's necessary for me to find that it was, that there was drug trafficking going on . . . . I don't think it's necessary for me to make that finding."  (Sent. Tr. 11) Later, the court stated that the cash "almost shouts drug trafficking to me," but "notwithstanding that belief" he would base the sentence on the fact that there were two felonies involved--Porfirio's distribution of the cocaine to José and José's possession of the cocaine.  Thus, the district court did not appear to base a trafficking finding on the presence of cash in the house.

Only Porfirio was found to have distributed cocaine, which would mean that the "clearly improbable" standard would not apply to José.  Moreover, at sentencing, the court asked the counsel for the government, "How do we know that [Porfirio] had a weapon at the time he obtained the drugs?"  Counsel for the government responded, "Well, we don't."  (Sent. Tr. 24) In this respect, this case is similar to Smith, in which we held that the evidence failed to establish a temporal link between the firearms and the drug offense because the evidence only established that the defendant had possessed the drug at some point in the past, not that he had done so while in possession of the guns: "We do not know if Smith used or possessed methamphetamine in his home in the days before the search or if he did, whether the firearms were present in his home at the time."  535 F.3d at 886.  Here, the evidence

-22-

did not establish when Porfirio distributed the cocaine to José, and so did not establish that the gun offense and drug offense had been contemporaneous.

Thus, in light of the important recent clarifications of our law, the district court erred in holding without the necessary predicate findings that it was required to apply the enhancement unless a connection between the drugs and the guns was clearly improbable. Applying the enhancement requires a finding either that the defendants were engaged in drug trafficking at the same time they possessed the guns or the more general finding that the guns facilitated or had the potential for facilitating a drug offense. Both findings are lacking on this record. Although the evidence in this case would apparently support either finding, fact issues are for the district court to decide. We must therefore remand the sentences for clarification of the findings.

. . .

We affirm the district court's denial of the suppression motion, but we remand for resentencing in accordance with this opinion.

_____